**No. 26-4486**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

X.AI CORP.; X.AI LLC,

*Plaintiffs-Appellants*,

v.

OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of California, No. 3:25-cv-08133-RFL, Hon. Rita F. Lin

# OPENING BRIEF FOR APPELLANTS


Paul J. Watford
KING & SPALDING LLP
633 W 5th Street, Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Mark Zambarda
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
mzambarda@kslaw.com

LeElle B. Slifer
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
lslifer@kslaw.com

Paul Alessio Mezzina
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com

*Counsel for Appellants*


August 24, 2026

*(Additional counsel listed on inside cover)*

Martha Banner Banks
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600
bbanks@kslaw.com

*Counsel for Appellants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... iii

INTRODUCTION .................... 1

JURISDICTION .................... 4

STATEMENT OF THE ISSUE .................... 4

STATEMENT OF THE CASE .................... 4

A. xAI relies on its trade secrets to compete with OpenAI in the market for cutting-edge artificial intelligence products .................... 5

B. OpenAI launched a campaign to poach key xAI employees and steal xAI's trade secrets .................... 8

C. xAI uncovered OpenAI's campaign and brought this litigation .................... 19

D. The district court dismissed xAI's complaint with prejudice .................... 21

SUMMARY OF ARGUMENT .................... 24

STANDARD OF REVIEW .................... 26

ARGUMENT .................... 27

I. xAI Plausibly Pleaded that OpenAI Misappropriated Its Trade Secrets .................... 27

A. xAI sufficiently alleged misappropriation by OpenAI in connection with Li's interview presentation .................... 27

1. xAI plausibly pleaded that Li disclosed protected trade secrets .................... 29

2. xAI plausibly pleaded OpenAI's knowledge .................... 35

3. The district court was wrong to conclude otherwise ........ 39

B. xAI sufficiently alleged that the Li presentation was part of a broader campaign of misappropriation by OpenAI........ 49

II. At Minimum, xAI Should be Granted the Opportunity to Amend Its Complaint ........ 54

CONCLUSION ........ 56

## TABLE OF AUTHORITIES

### Cases

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
59 F.4th 948 (8th Cir. 2023) .............................................. 33, 41

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
711 F. Supp. 3d 873 (M.D. Tenn. 2024) .............................................. 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................. 2, 4, 33, 52

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) .............................................. 27

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
2016 WL 11523446 (C.D. Cal. Oct. 17, 2016) .............................................. 39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................. 3, 49, 53

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020) .............................................. 38

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987) .............................................. 54

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .............................................. 26

*Elko, Inc. v. WTH Com. Servs., LLC*,
2023 WL 6141623 (D. Nev. Sept. 20, 2023) .............................................. 38

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
893 F.3d 1176 (9th Cir. 2018) .............................................. 38

*Huddleston v. United States*,
415 U.S. 814 (1974) .............................................. 29

*In re Vitamins Antitrust Litig.*,
120 F. Supp. 2d 58 (D.D.C. 2000) .............................................. 35

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) .......... 28

*JustMed, Inc. v. Byce*,
600 F.3d 1118 (9th Cir. 2010) .......... 24, 28, 45

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
659 F. Supp. 3d 138 (D. Mass. 2023) .......... 37

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021) .......... 3, 45, 53, 54

*Ocasio-Hernández v. Fortuño-Burset*,
640 F.3d 1 (1st Cir. 2011) .......... 52

*Redd v. Guerrero*,
84 F.4th 874 (9th Cir. 2023) .......... 49

*Rosebud Sioux Tribe v. A & P Steel, Inc.*,
733 F.2d 509 (8th Cir. 1984) .......... 34

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......... 41

*Samuel Sherbrooke Corp. v. Mayer*,
159 F.4th 252 (4th Cir. 2025) .......... 33

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011) .......... 28

*Schwake v. Ariz. Bd. of Regents*,
967 F.3d 940 (9th Cir. 2020) .......... 49

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010) .......... 45

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) .......... 33

*Source Prod. & Equip. Co. v. Schehr*,
2017 WL 3721543 (E.D. La. Aug. 29, 2017) .......... 32

*St. Clair v. Cnty. of Okanogan*,
154 F.4th 1154 (9th Cir. 2025) .......... 26

*Sys. 4, Inc. v. Landis & Gyr, Inc.*,
8 F. App'x 196 (4th Cir. 2001) .......... 46

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 52

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*,
931 F.3d 966 (9th Cir. 2019) .......... 52

*United States v. Smith*,
155 F.3d 1051 (9th Cir. 1998) .......... 28

*Walgreen Co. v. Haseotes*,
778 F. Supp. 3d 264 (D. Mass. 2025) .......... 37

*Waln v. Dysart Sch. Dist.*,
54 F.4th 1152 (9th Cir. 2022) .......... 33

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) .......... 33, 53

**Statutes & Rules**

18 U.S.C. § 1839(5) .......... 1, 24, 28, 45

18 U.S.C. § 1839(6) .......... 24

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 4

Fed. R. Civ. P. 15(a)(2) .......... 54

**Other Litigation**

Complaint,
*Apple Inc. v. Liu*,
No. 5:26-cv-07078 (N.D. Cal. July 10, 2026), Dkt. 1 .......... 1, 23, 24, 42

Complaint,
*X.AI Corp. v. Li*,
No. 3:25-cv-07292 (N.D. Cal. Aug. 28, 2025), Dkt. 1 .......................... 19

Motion for Temporary
Restraining Order, Order to Show Cause,
& Order Permitting Expedited Discovery,
*X.AI Corp. v. Li*, No. 3:25-cv-07292
(N.D. Cal. Aug. 28, 2025), Dkt. 8 .......................................................... 20

Order Granting
Plaintiffs' Motion for
Temporary Restraining Order
and Permitting Expedited Discovery as Modified,
*X.AI Corp. v. Li*, No. 3:25-cv-07292
(N.D. Cal. Sept. 2, 2025), Dkt. 20 ........................................................ 20

Order,
*X.AI Corp. v. Li*, No. 3:25-cv-07292
(N.D. Cal. Apr. 29, 2026), Dkt. 130 ...................................................... 55

**Other Authorities**

Gibson, Scott F.
*Important Considerations: Conducting a Trade Secret Audit*, 53 No. 2 DRI For Def. 36 (2011) ............................................... 47

Gray, Thomas J. & Peter O'Rourke,
*Preventing Employee Trade Secrets Misuse from Derailing Your Company*,
132 I.P. Couns. Art. I (2007) ................................................................. 47

Restatement (Third)
of Unfair Competition § 43 (1995) ........................................................ 32

Sedona Conf.,
Working Grp. 12,
*Defend Trade Secrets Act Model Jury Instructions: 2026 DTSA Tenth Anniversary Commemorative Edition*,
Instruction 4.1, 27 Sedona Conf. J. (forthcoming 2026) ..................... 29

Webster's New International Dictionary (3d ed. 1966) ..........................29

Webster's Third New International Dictionary (3d ed. 1993)................28

# INTRODUCTION

xAI brought this action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), to redress OpenAI's campaign to misappropriate xAI's trade secrets by poaching key employees who unlawfully retained, accessed, and disclosed those trade secrets after departing for OpenAI. This is just one of multiple pending cases making clear that "OpenAI has no qualms with manipulating" its competitors' "former [] employees to steal" their "technical advancements, source code, and business plans" for its own benefit. ER-81 ¶ 22; *see also* Complaint at 20, *Apple Inc. v. Liu*, No. 5:26-cv-07078 (N.D. Cal. July 10, 2026), Dkt. 1 (alleging that "OpenAI has been stealing Apple's trade secrets and confidential information through current and former Apple employees").

The district court misapplied the clear text of the DTSA when it dismissed xAI's complaint. The statute permits plaintiffs to bring claims for trade secret misappropriation, defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). xAI's allegations plainly satisfy this definition. The operative complaint plausibly pleads that OpenAI knowingly acquired xAI's trade secrets

from Xuechen Li, a senior xAI engineer with extensive knowledge of proprietary model-training techniques who stole xAI's entire codebase and disclosed the company's trade secrets during job interviews with OpenAI in breach of his confidentiality obligations. *See* ER-87–92 ¶¶ 55–74. These allegations are sufficient on their own to state a misappropriation claim. But xAI also pleaded additional facts that further support its misappropriation claim: At the same time OpenAI was recruiting Li, it sought to poach a number of other xAI employees with access to confidential information about competitive advantages that OpenAI was seeking to replicate—several of whom later secretly downloaded xAI's confidential information, including substantial portions of its Grok codebase, to their personal devices or attempted to access it once they departed for OpenAI. *See* ER-98–109 ¶¶ 107–55.

In concluding that xAI failed to state a viable DTSA claim, the district court also misapplied the Rule 12(b)(6) standard. It adopted an impermissibly narrow reading of xAI's complaint, parsing individual allegations, rejecting reasonable inferences, and imposing a heightened pleading standard akin to "'probability,'" not "plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 556 (2007)); *see, e.g., Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 912–13 (3d Cir. 2021) (chastising district court for "erroneously appl[ying] a heightened pleading standard" to misappropriation claims and observing that "[t]he question at the pleading stage is simply whether [plaintiff] provided allegations of misappropriation sufficient to raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true" (quotation marks omitted)).

The district court's decision sets an impossibly high bar for pleading trade secret claims, undermining the DTSA's protections and supplying a roadmap for bad actors to evade liability. As another court put it, "[i]n essence, the [d]istrict [c]ourt asked for direct proof of misappropriation, without permitting the discovery essential to uncovering the evidence for proper consideration of the merits." *Oakwood Labs.*, 999 F.3d at 913. If xAI's fulsome allegations are not sufficient, few plaintiffs will be able to plead viable misappropriation claims and redress their competitors' trade secret theft.

This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arises under the DTSA, a federal statute.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted OpenAI's motion to dismiss on June 15, 2026, and entered judgment that same day. ER-5–11; ER-4. xAI timely filed its notice of appeal on July 13, 2026. ER-240–42.

## STATEMENT OF THE ISSUE

Whether xAI stated a plausible claim for misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, via detailed allegations that its competitor, OpenAI, undertook a coordinated campaign to poach key employees with knowledge of xAI's core technologies and business plans and thereby acquire xAI's trade secrets from them.

## STATEMENT OF THE CASE[1]

As detailed in the SAC, this case arises from OpenAI's efforts "to steal … xAI's trade secrets" through a number of "former xAI employees"

[1] This Statement of the Case is drawn from the Second Amended Complaint's ("SAC") well-pleaded factual allegations, which must be taken as true on review of the district court's decision granting OpenAI's motion to dismiss. *See Iqbal*, 556 U.S. at 679.

in order to "undermine xAI and gain unlawful advantage in the race to build the best artificial intelligence models." ER-74 ¶¶ 1–2.

### A. xAI relies on its trade secrets to compete with OpenAI in the market for cutting-edge artificial intelligence products.

Generative artificial intelligence, or "AI," "refers to systems that can create new content—text, images, music, code, and more—by learning patterns from massive datasets." ER-82 ¶ 31. In contrast to traditional AI, which generally provides "rote or stilted responses" that make classifications or predictions, generative AI "produces outputs that are similar to what would be expected when a human responds in a conversation." ER-82 ¶ 31. Generative AI models "are built upon sophisticated architectures" whose development "requires extraordinary financial and technical resources" related to "data acquisition and processing, computational infrastructure, and expert talent." ER-82 ¶¶ 33–34.

xAI and OpenAI offer competing generative AI products. OpenAI released its first generative AI chatbot, "ChatGPT," in November 2022. ER-83 ¶ 36. But despite its "first-mover position," OpenAI soon faced competition from other, more innovative and nimble competitors like xAI,

which began offering its own AI products in November 2023. ER-83 ¶¶ 38–39.

xAI's "vision" is "to advance human comprehension and capabilities through its advanced AI," including its generative AI model, "Grok." ER-83 ¶ 39. Grok is a "conversational" model capable of "performing natural language processing tasks," such as "answering questions, retrieving information, writing creatively, and assisting with coding"; "interpreting, editing, and generating images or videos in various styles"; and "generating natural language audio responses" to users' oral prompts. ER-83 ¶ 40. The newest version of Grok, "Grok 4," was released in July 2025 and represents "the culmination of years of research and development, and billions of dollars in investments." ER-84 ¶¶ 41–42. Grok 4 is "one of the most, if not the most, intelligent generative AI systems," and it quickly overtook ChatGPT and other competitors "on benchmarks for complex reasoning." ER-84, 89 ¶¶ 41, 63.

Grok 4's success is attributable to xAI's innovative technical developments, many of which constitute trade secrets that are critical to xAI's ability to compete with OpenAI and other frontier AI companies. These include xAI's "reinforcement-learning-related innovations;

specifically, xAI's ability to scale reinforcement learning and invest more in post[-]training techniques—areas in which OpenAI was lagging." ER-89 ¶ 63. In addition, xAI's "unique ability to rapidly build and deploy data centers" in just "a fraction of the time" as its competitors has also given Grok a competitive "edge," since "training large language models" requires "massive amounts of parallel processing power." ER-84 ¶ 45.

To protect these trade secrets, xAI "has implemented a variety of industry standard" practices, including requiring each of its employees to enter into confidentiality agreements. ER-85–86 ¶¶ 48–49. Those agreements:

> (1) prohibit xAI employees from disclosing, using, or publishing all confidential knowledge, data, or information ("Confidential Information") belonging to xAI during and after their employment;
>
> (2) require xAI employees to acknowledge that the employment creates a relationship of confidence and trust with respect to xAI's Confidential Information, which xAI has a protectable interest therein;
>
> (3) require xAI employees to return all Confidential Information to xAI and permanently delete any Confidential Information on their personal devices upon termination of their employment; and

> (4) require xAI employees to maintain xAI's confidentiality during and after their employment.

ER-85–86 ¶ 49.

### B. OpenAI launched a campaign to poach key xAI employees and steal xAI's trade secrets.

Fearful of competition from Grok 4 and realizing that it was lagging behind xAI in data center deployment, OpenAI embarked on a campaign to poach xAI's superior talent and acquire its trade secrets. OpenAI "target[ed] … individuals with knowledge of xAI's key technologies and business plans—including xAI's source code and its operational advantages in launching data centers—where OpenAI face[d] a competitive threat," then acquired xAI's trade secrets from those employees in "breach [of] their confidentiality and other obligations to xAI." ER-76–77 ¶ 10.

***Xuechen Li.*** OpenAI's efforts began with Xuechen Li, a "senior" xAI engineer who was among the company's earliest hires and had significant experience "developing and training Grok." ER-87, 89 ¶¶ 55–56, 64. Notably, Li was "responsible for the reinforcement learning and post[-]training techniques" that drove Grok 4's success and allowed it to outperform ChatGPT in "complex reasoning." ER-89 ¶¶ 62–64.

Li's OpenAI interview process began in July 2025. ER-89 ¶ 65. As part of the interview process, OpenAI "asks candidates to deliver a presentation about a prior project" to "senior members of [its] technical staff." ER-89 ¶ 66. These presentations are not "one-sided conversation[s]," but rather "deep dive[s]" that "address[] technical aspects of the project and the candidate's specific contributions" and "often involve[] detailed examination about lessons learned, alternatives considered, scaling insights, and more." ER-89 ¶ 66.

"[T]o prepare for his interviews with OpenAI, Li created a slide deck titled 'interview slides 07-13-25,' which, on information and belief, he presented … to his OpenAI interviewers during one or more of his interviews" on "July 21–22, 2025." ER-89–90 ¶¶ 68, 70. Specific slides within the deck reveal that Li shared with his interviewers "confidential trade secrets about xAI's products and model training," including "details of xAI's training recipes and checkpoints"; "sources of problems in post-training AI models," including "details of [such] problems identified in xAI's model training"; "experience with different training recipes and which methods provided the best results"; and "details" and "specific characteristics of xAI's internal training," including "training for model

behavior." ER-90–91 ¶ 71. And even "beyond the face of the slides," it is reasonable to infer that Li "revealed even more detailed information and additional trade secrets," given that it is "standard practice in the AI industry that interview candidates will orally provide much more detailed information regarding the materials reflected in their interview slides." ER-92 ¶ 72.

"Li's OpenAI interviewers knew or should have known that Li, through this slide deck and related presentation, was improperly disclosing xAI trade secrets to them." ER-90–91 ¶ 71. As detailed in the SAC, OpenAI's actual or constructive knowledge is inferable "for multiple reasons." ER-90–91 ¶ 71.

First, the "content of the presentation" itself would have made this clear. ER-90–91 ¶ 71(a). The presentation explicitly identified xAI's products by name and discussed xAI's model training in detail. ER-90–91 ¶ 71(a). It is "well-understood in the AI industry" that the type of information Li disclosed "constitute[s] highly confidential and highly valuable trade secret information." ER-90–91 ¶ 71(a). Indeed, "[t]his is precisely the type of information that would be most useful to a competitor in improving the design of [its] AI models," and the "OpenAI

engineers who interviewed Li, who were focused on post-training and/or reinforcement learning, would have the technical background necessary to know the value of this information and to recognize that it was highly confidential." ER-90–91 ¶ 71(a).

Second, "[t]he relationship between the presentation's content and Grok 4" would have further alerted Li's interviewers that his presentation improperly disclosed xAI trade secrets. ER-91 ¶ 71(b). The presentation "explicitly referred to Li's work training Grok 4" and "focused specifically on xAI's reinforcement learning techniques—exactly what enabled Grok 4's strong critical reasoning performance." ER-91 ¶ 71(b). The OpenAI engineers interviewing Li would have understood how this information was "directly relevant to [their] own work in studying how to improve … the ChatGPT model's performance in complex reasoning" in the wake of Grok 4's "widely publicized" release. ER-91 ¶ 71(b).

Third, the "first page of Li's interview deck [was] conspicuously and unmistakably marked as 'confidential material.'" ER-91 ¶ 71(c). That marking is an additional reason why Li's interviewers "understood or

should have reasonably understood that the contents of the deck constituted xAI's trade secrets." ER-91 ¶ 71(c).

Fourth, the OpenAI interviewers knew or should have known from their own experience that the information Li was disclosing to them would be treated by xAI as confidential. Given the "prevalence of confidentiality agreements in the AI industry" and the fact that Li and his interviewers had, on information and belief, "signed similar agreements," the OpenAI interviewers "should have understood that, when Li was delivering his presentation, he was violating his contractual confidentiality duties to xAI." ER-91 ¶ 71(d).

After Li revealed xAI's trade secrets to his interviewers, OpenAI continued to pursue his candidacy, including through a series of highly suspicious encrypted communications. On July 23, the day after the last of Li's interviews, "OpenAI Research Talent Advisor Tifa Chen sent a disappearing message request to Li via the encrypted messaging application Signal." ER-92–93 ¶ 75. The following day, Chen sent Li another message that, upon information and belief, "link[ed] to … a cloud storage location." ER-92–93 ¶ 75. And the day after that, July 25, "Li uploaded the *entire xAI source code base*—the crown jewel of xAI's trade

secrets—to a personal cloud account" to which OpenAI had access, along with a confidential xAI slide deck "providing an in-depth overview of the infrastructure for the same reinforcement learning training framework that Li disclosed in his interview presentation." ER-93 ¶¶ 76, 78. Li then "deleted his browser history and system logs … to try to cover his tracks." ER-93 ¶ 78. "Between the algorithm training that Li disclosed to OpenAI in his interviews and the infrastructure overview Li stole," OpenAI "had access to two critical aspects of xAI's training of Grok 4." ER-93 ¶ 77.

OpenAI swiftly recognized the significance of Li's disclosures. "At 3:28 p.m. on July 25—four hours after Li's successful pilfering of xAI's source code—Chen expressed disbelief, sending Li a message on Signal that equated to 'no way!'" ER-93 ¶ 80. Just "[t]wo minutes later," the two entered a "virtual meeting." ER-94 ¶ 81. And two days later, on July 27, Li once "again downloaded xAI Confidential Information to his personal laptop." ER-94 ¶ 82. On July 28, "Chen communicated OpenAI's offer of multiple millions of dollars … to Li[]," who signed his offer letter with OpenAI "[b]y August 1." ER-94 ¶¶ 83–84. OpenAI did not withdraw that offer until xAI obtained a temporary restraining order to prevent Li from

working for OpenAI, as discussed *infra*, and specifically informed OpenAI of the order. ER-96 ¶ 99.

After accepting OpenAI's offer, Li continued to try to obscure his wrongdoing. In subsequent interviews with xAI, "Li hid OpenAI's involvement, failing to mention that he had accepted an offer to work for them, let alone any of his clandestine conversations with Chen." ER-94 ¶ 86. And when signing a "Termination Certificat[e] required by his agreements with xAI," Li "falsely certified" that he had returned all company documents and materials embodying confidential information and "reiterated his agreement" to avoid disclosing that information—even though he had "already violated" that contractual commitment. ER-94 ¶ 87. In the following days, Li changed the password to the cloud account where he had uploaded the xAI source code and other confidential information—including the interview slide deck—and accessed his "Trash folder" several times, which is "where a user must go to permanently delete files in that account." ER-95–96 ¶¶ 88–97. After xAI began to suspect that something was amiss with Li and confronted him, Li authorized xAI to search his devices but claimed that he could not remember the password to his cloud account even though he had just

changed it four days earlier. ER-95–96 ¶¶ 95–96. And in subsequent legal proceedings, Li has "pleaded the Fifth Amendment when asked whether he shared xAI's trade secrets with OpenAI." ER-96–97 ¶ 100; *see* ER-92 ¶ 72.

***Other Employees.*** At the same time it was recruiting and obtaining trade secrets from Li, OpenAI also poached at least *seven* other xAI employees with strategic knowledge and expertise relevant to OpenAI's efforts to improve ChatGPT's performance and data center deployment, many of whom likewise stole xAI's trade secrets on their way out the door. ER-108–09 ¶ 155.

For example, in July 2025, the same OpenAI "Research Talent Advisor" who was communicating with Li via disappearing encrypted messages was also targeting Jimmy Fraiture, another "senior" engineer who "was the second engineering hire in xAI's London operation." ER-98, 99 ¶¶ 107–08, 113–15. Like Li, Fraiture had access to Grok 4's "confidential source code," which he developed and used in his role "[a]s the leader of xAI's production inference team … responsible for maintaining and developing inference clusters … that provide critical functions to xAI's customers using Grok." ER-98 ¶¶ 108–10. Also like Li,

Fraiture was recruited to OpenAI by Chen, and the two "communicated via Signal" in the days and weeks before OpenAI made Fraiture a formal employment offer "includ[ing] substantial compensation" on July 29. ER-99–100 ¶¶ 113–17.

Concurrently with those communications, Fraiture also stole xAI's trade secrets, and in a manner that mirrored Li's conduct. "Just two days after receiving the offer," Fraiture copied "xAI source code and trade secrets from his xAI-issued laptop to his personal device." ER-100 ¶ 118. As with Li, the scope of the theft was astonishing: Fraiture took "the majority of xAI's code regarding the backend infrastructure for which he and his team … were responsible"; "extensive infrastructure and training code"; "new and experimental code" from several xAI co-founders and other employees; and a "video recording of a lengthy internal xAI 'All-Hands' meeting." ER-100–01 ¶¶ 118–22. And "[m]uch like Li, after having accepted his offer with OpenAI, Fraiture turned to deleting evidence of his wrongdoing" and lying to xAI about his trade secret theft. ER-101 ¶ 123. The FBI seized both Fraiture's and Li's devices "as part of an ongoing criminal investigation into their conduct." ER-74 ¶ 3.

Along with Li and Fraiture, OpenAI also "target[ed] other xAI employees with access to the specific xAI Confidential Information related to xAI's most significant technological innovations, particularly [its] data centers." ER-102 ¶ 130. These efforts overlapped with OpenAI's July 2025 "announce[ment] that it had taken on a $300 billion partnership with Oracle to expand its data center capabilities to provide more computing capacity—which it would need to scale up ChatGPT's reinforcement learning and improve the model's complex reasoning performance." ER-107 ¶ 149.

To that end, OpenAI recruited an xAI "senior finance executive …. solely because of his experience with xAI's data centers," which he had described as the company's "secret sauce." ER-102, 103–04 ¶¶ 131, 135–37. The finance executive "refused to sign a termination statement confirming his compliance with his confidentiality obligations to xAI," and when xAI's counsel confronted him about confidentiality-related concerns, he crudely responded, "Suck my dick." ER-104–05 ¶¶ 139–41. xAI later learned that this finance executive has since disclosed to OpenAI confidential information "about executive compensation at xAI, confidential potential business deals and other

financial transactions … [with] third parties, confidential communications with xAI's investors, and xAI's internal financial practices and strategies." ER-105 ¶ 142.

OpenAI's "hiring spree" also included five other "former xAI employees who worked on xAI data center solutions or the development of Grok 4" and had access to xAI trade secrets: Uday Ruddarraju, Sreekanth Pothanis, Mike Dalton, Hieu Pham, and Ethan Knight. ER-105–06 ¶ 143. After leaving xAI, Knight and Pham "admitted to keeping copies of xAI related work chats and information on their personal devices," but both "refused requests to identify the specific information they kept" or "turn over their devices" so that xAI could confirm its deletion. ER-107 ¶ 150. And after he began working at OpenAI, Ruddarraju "used his personal Gmail account to attempt to access a confidential, internal xAI document" relating to hiring candidates to support "datacenter optimization." ER-107–08 ¶ 153.

In sum, an "alarming number" of former xAI employees hired by OpenAI violated their contractual confidentiality obligations, "all in [the] short time period" around July 2025 when OpenAI was attempting to ramp up its own data center operations and enhance its competing

generative AI model. ER-108–09 ¶¶ 154–55. "[A]t least six of the eight xAI employees targeted by OpenAI in [those] few months attempted to or actually did take xAI Confidential Information on their way out the door to take to OpenAI, at least three of them have used or disclosed such information while they were employed at OpenAI, and at least one of them disclosed such information to OpenAI during interviews." ER-108–09 ¶ 155. This pattern of data theft is "unprecedented": "xAI has (to its knowledge) never before had any employee steal source code" and other confidential information "in the volume or at the significant value" of that taken by the employees OpenAI hired. ER-78, 102 ¶¶ 13, 129.

### C. xAI uncovered OpenAI's campaign and brought this litigation.

Upon learning of Li's data theft, xAI immediately sued him for breach of contract, trade secret misappropriation, fraud, and California statutory violations in August 2025. *See* Complaint, *X.AI Corp. v. Li*, No. 3:25-cv-07292 (N.D. Cal. Aug. 28, 2025), Dkt. 1. xAI simultaneously sought a temporary restraining order to prevent Li from working at OpenAI, as well as expedited discovery regarding Li's unlawful retention and disclosure of xAI data and confidential materials. *See* Motion for Temporary Restraining Order, Order to Show Cause, & Order Permitting

Expedited Discovery, *Li*, No. 3:25-cv-07292, Dkt. 8. The district court swiftly granted xAI's motion, entering the temporary restraining order and requiring Li to provide discovery and sit for a deposition. *See* Order Granting Plaintiffs' Motion for Temporary Restraining Order and Permitting Expedited Discovery as Modified, *Li*, No. 3:25-cv-07292 (N.D. Cal. Sept. 2, 2025), Dkt. 20. The case has since proceeded in discovery.

xAI's investigation of trade secret theft by Li and others gradually revealed the extent of OpenAI's involvement. Accordingly, several weeks after suing Li and obtaining the temporary restraining order, xAI filed this action against OpenAI, alleging trade secret misappropriation under the DTSA based on OpenAI's role in the theft of xAI's confidential information by Li, Fraiture, and the senior finance executive. *See* ER-210–39. The district court declared the two cases related and assigned them to the same judge, Hon. Rita F. Lin. *See* ER-209.

OpenAI moved to dismiss the initial complaint, which xAI then voluntarily amended. *See* ER-189–208; ER-155–88; ER-153–54. The First Amended Complaint ("FAC") added allegations about OpenAI's campaign to poach additional xAI employees, including Knight, Pham, and Ruddarraju, and those employees' subsequent wrongful retention,

access, and disclosure of confidential xAI materials. *See, e.g.,* ER-179–81 ¶¶ 122–31. OpenAI filed another motion to dismiss, which the district court granted without prejudice, as discussed *infra*. *See* ER-132–52; ER-117–31.

xAI filed the SAC in March 2026, adding additional allegations based on evidence discovered in the separate action against Li. *See* ER-73–116. Most significantly, the SAC pleaded additional details about Li's disclosure of trade secrets to OpenAI during his interviews. *See, e.g.,* ER-89–92 ¶¶ 64–73. OpenAI moved to dismiss the SAC, and the district court granted that motion, this time with prejudice. *See* ER-51–72; ER-5–11.

### D. The district court dismissed xAI's complaint with prejudice.

The district court's reasoning for its ultimate decision to dismiss this case with prejudice is found across its two dismissal orders. *See* ER-5 (referring to initial dismissal order in order dismissing SAC).

In the first order, the district court held that the FAC did not sufficiently allege that OpenAI "encouraged" or "induced" xAI's employees to disclose trade secrets. ER-123–25. Although the court acknowledged that "Li allegedly disclosed xAI's confidential information in a presentation to OpenAI," it concluded that the allegations did not

support a reasonable inference that OpenAI "knew" either that the information was a trade secret or that Li's disclosure of the information was improper. ER-125–26. The court also concluded that xAI's allegations regarding employees other than Li failed to plausibly plead misappropriation. *See* ER-127–30. The court dismissed the FAC without prejudice, granting xAI leave to file an amended complaint. ER-131.

In its second dismissal order, the district court held that the SAC's additional allegations were insufficient to establish that OpenAI "told or encouraged" xAI's former employees to disclose xAI's trade secrets. ER-6–7 (quotation marks omitted). With regard to Li specifically, the court again did not question that xAI adequately alleged Li's disclosure of trade secrets in his presentation to OpenAI. *See* ER-7–8, 10. But the court again held that xAI's allegations were insufficient to support a reasonable inference that OpenAI "knew or should have known" either that Li was disclosing trade secrets or that the disclosure was improper. ER-7–10. The court also held that even if OpenAI did know that Li was improperly disclosing xAI's trade secrets, that "would still not be enough to state a misappropriation claim" because it would allege only "passive

receipt of trade secrets" and not the "active conduct" the district court believed the DTSA required. ER-10–11.

Because the court held that xAI had "failed to cure the deficiencies identified" in the first dismissal order, it concluded that "further amendment would be futile" and dismissed the SAC with prejudice. ER-11. The court entered the dismissal and a corresponding judgment on June 15, 2026. ER-5–11; ER-4.

Shortly after the district court dismissed the SAC with prejudice, Apple filed a complaint against OpenAI alleging a campaign of trade secret misappropriation strikingly similar to what xAI had experienced. *See* Complaint, *Liu*, No. 5:26-cv-07078, Dkt. 1. Like xAI, Apple identifies "a pattern of theft of [its] trade secrets by OpenAI employees who were formerly at Apple" and alleges that "OpenAI has been stealing Apple's trade secrets and confidential information through current and former Apple employees." *Id.* at 1, 20. Apple similarly alleges that OpenAI communicated with candidates via a "private[]" messaging app, that OpenAI "elicit[s] Apple confidential information" during candidates' interviews, and that candidates hired by OpenAI "emailed themselves

Apple's confidential information to personal accounts on their way out the door." *Id.* at 2–3.

Three days after the submission of Apple's complaint, xAI timely filed its notice of appeal in this action. *See* ER-240–42.

## SUMMARY OF ARGUMENT

The district court erred when it dismissed xAI's complaint with prejudice for failure to state a claim. This Court should reverse.

**I.** xAI pleaded a viable DTSA claim.

**A.** To state a claim for misappropriation under the DTSA, a plaintiff must plausibly allege that the defendant acquired (came into possession of) the plaintiff's trade secrets under circumstances where the defendant knew or should have known that those trade secrets were obtained in breach of a duty to maintain confidentiality. *See* 18 U.S.C. § 1839(5)(A), (6)(A); *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010). xAI met this standard. The SAC plausibly pleads that: (1) OpenAI acquired its trade secrets when Li disclosed them during his interview presentation; and (2) OpenAI knew or should have known that Li's disclosure of those trade secrets breached his contractual confidentiality obligations to xAI given the context and content of his presentation. *See* ER-87–92 ¶¶ 55–

74. In deeming these allegations insufficient, the district court misapplied Rule 12(b)(6)'s dismissal standard and misconstrued the DTSA's legal requirements for misappropriation.

**B.** Although the allegations regarding Li are sufficient on their own, xAI's other well-pleaded allegations further support its misappropriation claim and make that claim all the more plausible. Li was just one of eight xAI employees whom OpenAI strategically targeted for their access to xAI trade secrets and other confidential information regarding reinforcement learning and data center optimization—information that OpenAI desperately wanted to improve ChatGPT's complex reasoning and regain its competitive edge. *See* ER-98–109 ¶¶ 107–55. In the midst of their departures for OpenAI, six of those eight employees downloaded, retained, accessed, or disclosed xAI's trade secrets and confidential information, breaching confidentiality clauses in their xAI contracts. *See* ER-98–109 ¶¶ 107–55. The scale, scope, and timing of this unprecedented data theft—much of which coincided with OpenAI's use of disappearing, encrypted messages to communicate with the guilty employees—points to a single conclusion: OpenAI used these employees in an unlawful

scheme to gain access to xAI's trade secrets for its own gain. The district court erred in rejecting xAI's DTSA claim.

**II.** At minimum, xAI should be given leave to amend its complaint. Further amendment would not be futile because, as the district court recognized, if necessary, xAI could plead additional detail regarding Li's presentation to OpenAI and attach a copy of the slide deck to further support its misappropriation claim. Moreover, xAI expects that its ongoing litigation against Li—which has already revealed evidence supporting its claim against OpenAI here—will uncover additional details that could be included in an amended pleading.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's decision to grant a motion to dismiss" under Rule 12(b)(6). *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152 (9th Cir. 2025) (quotation marks omitted). And while the Court "review[s] the denial of leave to amend for an abuse of discretion," it "review[s] the futility of amendment de novo." *St. Clair v. Cnty. of Okanogan*, 154 F.4th 1154, 1161 (9th Cir. 2025) (quotation marks omitted).

# ARGUMENT

## I. xAI Plausibly Pleaded that OpenAI Misappropriated Its Trade Secrets.

The district court erred when it concluded that xAI failed to state a viable claim for misappropriation of trade secrets. The SAC plausibly alleges that OpenAI acquired xAI's trade secrets when Li disclosed them during his interview presentation, and that OpenAI's engineers would have easily recognized the presentation as containing trade secrets subject to confidentiality protections based on their industry experience. The SAC's additional allegations regarding an unprecedented pattern of data theft by former employees recruited by OpenAI at the same time as Li further support the misappropriation claim and enhance its plausibility.

### A. xAI sufficiently alleged misappropriation by OpenAI in connection with Li's interview presentation.

xAI stated a plausible DTSA claim based on its allegations about Li's interview presentation to OpenAI's engineers. This Court need go no further to reverse the district court's dismissal of the claim.

The DTSA "creates a private right of action for any misappropriation of a trade secret." *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020) (quotation marks omitted). To plead a viable DTSA

claim, xAI had to plausibly allege: "(1) that [xAI] possessed a trade secret; (2) that [OpenAI] misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to [xAI]." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)). Only the second element, misappropriation, was disputed below. *See* ER-5 ("OpenAI moves to dismiss on the basis that xAI insufficiently alleges misappropriation.").

The statute defines "misappropriation" to include "the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," such as "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(5)(A), (6)(A). The DTSA does not define the term "acquired," so that term takes its "ordinary meaning." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 416 (2011). As this Court held when interpreting an identical misappropriation provision under state trade secret law: "Acquire means 'to come into possession, control, or power of disposal of.'" *JustMed*, 600 F.3d at 1129 (quoting Webster's Third New International Dictionary 18 (3d ed. 1993)) (interpreting Idaho Trade Secrets Act); *accord United States v. Smith*, 155 F.3d 1051, 1055 & n.7 (9th Cir. 1998) (the "ordinary

meaning" of "[t]he term acquisition" is "the act of acquiring, or coming into possession of" something); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' … mean[s] simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New International Dictionary (3d ed. 1966))); Sedona Conf., Working Grp. 12, *Defend Trade Secrets Act Model Jury Instructions: 2026 DTSA Tenth Anniversary Commemorative Edition*, Instruction 4.1, 27 Sedona Conf. J. (forthcoming 2026) ("'Acquisition' ordinarily means the gaining of possession or control over something.").

Accordingly, if (1) Li disclosed xAI's trade secrets to OpenAI during his presentation (causing OpenAI to come into possession of them), and (2) OpenAI knew or had reason to know that Li was improperly disclosing xAI's trade secrets, then OpenAI is liable for misappropriation. The SAC adequately pleads both prongs.

**1. xAI plausibly pleaded that Li disclosed protected trade secrets.**

xAI sufficiently alleged that Li disclosed xAI's trade secrets in his presentation to OpenAI. OpenAI did not dispute below that the SAC plausibly pleaded OpenAI's "receipt" of xAI's confidential information via interviewers who "heard or saw Li present about xAI trade secrets." ER-

57, 65. Nor did the district court seriously question whether xAI had sufficiently alleged disclosure of protected trade secrets by Li, in either the FAC or the SAC. Instead, the court assumed that disclosure was sufficiently alleged and focused only on OpenAI's knowledge. *See, e.g.,* ER-125 ("Li allegedly disclosed xAI's confidential information in a presentation to OpenAI, but xAI alleges no facts that permit a reasonable inference that OpenAI knew that the information was a trade secret."); ER-10 ("xAI does not sufficiently allege that OpenAI knew or should have known that Li disclosed xAI's trade secrets in his presentation.").

No basis exists to question the sufficiency of the allegations as to the disclosure prong, as the SAC's allegations are more than sufficient. As xAI has alleged, shortly after Grok 4's launch in July 2025, OpenAI reached out to Li, a senior xAI engineer who had significant experience developing and training Grok. ER-87, 89 ¶¶ 56, 64. Specifically, Li was responsible for the reinforcement-learning and post-training techniques that had driven Grok 4's success and were directly relevant to OpenAI's efforts to improve ChatGPT's ability to perform complex reasoning. ER-89, 90–91 ¶¶ 64, 71. As part of the recruiting process, OpenAI directs candidates like Li to deliver a presentation about technical aspects of a

prior project and the candidate's specific contributions. ER-89 ¶ 66. Such presentations are not "one-sided conversation[s]"; rather, they "often involve[] detailed examination about lessons learned, alternatives considered, scaling insights, and more." ER-89 ¶ 66. To prepare for his interviews, Li created a slide deck and, upon information and belief, shortly thereafter presented it during a series of lengthy interviews with multiple OpenAI engineers over the course of two days. ER-89–90 ¶ 68. The slides reveal xAI trade secrets about model training, including details about xAI's training recipes, sources of problems in post-training models, xAI's experience with different training methods, and details of xAI's training for model behavior. ER-89–91 ¶¶ 68, 71.

Courts have held similar allegations sufficient to plead acquisition of trade secrets in other cases. In *Allergan, Inc. v. Revance Therapeutics, Inc.*, for example, the plaintiff "sufficiently alleged that Defendant … acquired [trade secrets] from [plaintiff's former employees]" by pleading that a former employee "shared" plaintiff's trade secrets "with Defendant in her job interview while still employed by Plaintiff." 711 F. Supp. 3d 873, 886–88 (M.D. Tenn. 2024). Likewise, in *Source Production & Equipment Co. v. Schehr*, "plaintiffs [] alleged sufficient facts to support

a plausible claim of misappropriation by wrongful acquisition" based on allegations that plaintiffs' former employee "improperly conveyed trade secrets to [plaintiff's] competitors, which accepted these secrets knowing that [he was] a former employee of [plaintiffs]." 2017 WL 3721543, at *4 (E.D. La. Aug. 29, 2017). In reaching this conclusion, the court relied on an analogous illustration from the Restatement:

> *A*, a large manufacturing company, employs *B* as an engineer. Angered by a termination of the employment, *B* makes unauthorized photocopies of engineering drawings depicting trade secrets used in the machines that manufacture *A*'s most successful product. *B* offers to provide the photocopies to *C*, a competing manufacturer. *C* accepts the photocopies from *B* with knowledge that *B* is a former employee of *A*. *C* has acquired *A*'s trade secrets by improper means.

*Id.* at *4 (quoting Restatement (Third) of Unfair Competition § 43 cmt. c, illus. 4 (1995)). So too here—OpenAI "acquired" xAI's trade secrets when it accepted their disclosure from Li during the interview process.

The fact that xAI's allegations of disclosure are made "on information and belief" does not make them any less valid. As another court of appeals recently recognized, "allegations pled on information and belief are sufficient to nudge [a DTSA] complaint across 'the line between possibility and plausibility,'" especially when "hard evidence" is "within

the sole control of" a defendant or third party and "[t]he rest of [a plaintiff's] detailed allegations, taken as true," support its overall theory of misappropriation. *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 956 (8th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678) (reversing dismissal of DTSA claim); *see also Samuel Sherbrooke Corp. v. Mayer*, 159 F.4th 252, 258 (4th Cir. 2025) (reversing dismissal of DTSA claim for which certain allegations were pleaded "[u]pon information and belief" because "[e]ach of the[] allegations [was] relevant to Appellants' misappropriation claim, and together they t[old] the story of the alleged misappropriation"); *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *10–11 (N.D. Cal. Aug. 24, 2021) ("Reliance on circumstantial evidence can be especially warranted in showing trade secret misappropriation: misappropriation and misuse can rarely be proved by convincing direct evidence." (quotation marks omitted)).

Here, xAI amply supported its pleading on information and belief by showing that "the belief is based on factual information that makes the inference of culpability plausible." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). The SAC alleged as fact, among other things, that

Li prepared for his OpenAI interviews by creating an interview presentation containing trade secrets, completed the interviews in secret about a week later, and then quickly received a lucrative job offer. Afterwards, Li tried to permanently delete any records of the slides (along with evidence of his other thefts). ER-95–96 ¶¶ 92–97. Far from being speculative, xAI's belief that Li disclosed trade secrets is an eminently reasonable inference from the pleaded facts. The contrary inference—that Li planned and prepared a secret presentation titled "interview slides 07-13-25" clearly containing xAI's trade secrets but changed his mind at the last minute—is farfetched, to say the least. xAI should not have to rule out that remote possibility at the motion-to-dismiss stage, where direct evidence regarding what transpired in the interviews is uniquely in OpenAI's possession.

The allegation that Li disclosed xAI's trade secrets to OpenAI was also bolstered by an adverse inference from Li's invocation of the Fifth Amendment. *See, e.g.*, *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 521 (8th Cir. 1984) ("The policies supporting the Fifth Amendment apply with even less force when a non-party witness testifies in a civil proceeding and thus, the Amendment should not work to preclude an

adverse inference in this situation."); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 58, 68 (D.D.C. 2000) (drawing adverse inference based on invocation of Fifth Amendment at motion-to-dismiss stage). The district court acknowledged that an adverse inference could be proper to establish *Li*'s improper disclosure and suggested only that xAI could not rely on an adverse inference to establish *OpenAI*'s knowledge. *See* ER-10 ("Any adverse inference that Li did share xAI trade secrets with OpenAI, however, is an insufficient basis to draw a plausible inference of OpenAI's knowledge."). As discussed *infra*, however, the SAC's other allegations amply establish OpenAI's knowledge.

xAI thus sufficiently alleged the first prong of its misappropriation claim—that Li disclosed, and OpenAI thus acquired (came into possession of), xAI's trade secrets.

**2. xAI plausibly pleaded OpenAI's knowledge.**

xAI also sufficiently alleged the second prong of its misappropriation claim: that OpenAI knew or had reason to know both that Li was disclosing xAI's trade secrets and that the disclosure was improper.

OpenAI's knowledge was inferable from the nature of the confidential information Li disclosed and the identity of the OpenAI employees to whom that information was disclosed. The first page of the interview slide deck was "conspicuously and unmistakably marked 'confidential material,'" and it "explicitly refer[enced] … Grok 4" and "xAI's products." ER-90–91 ¶¶ 71(a)–(c). And regardless of that marking, "[i]t is well understood in the AI industry that the type of information reflected in Li's slide deck constituted highly confidential and highly valuable trade secret information." ER-90–91 ¶ 71(a). The "trade secrets about xAI's products and model training" contained in the slide deck were "precisely the type of information that would be most useful to a competitor in improving the design of their AI models, particularly to the employees of the competitor working on post-training and reinforcement learning." ER-90–91 ¶ 71(a). And that is exactly who interviewed Li: "OpenAI engineers" with "the technical background necessary to know the value of this information and to recognize" it as "trade secret[s]." ER-90–91 ¶ 71(a); *see* ER-91 ¶ 71(b) (explaining how the "relationship between the presentation's content and Grok 4" meant that the OpenAI interviewers knew or should have known that Li was divulging xAI trade

secrets). Given their experience and the "prevalence of confidentiality agreements in the AI industry," the interviewers would have "understood that, when Li was delivering his presentation, he was violating his contractual confidentiality duties to xAI." ER-91 ¶ 71(d).

Courts have held similar allegations sufficient to establish a defendant's knowledge that trade secrets were improperly disclosed. In *Walgreen Co. v. Haseotes*, for example, the court held that the plaintiff "sufficiently alleged" that given their "sophisticated experience" in the industry, defendants "knew or should have known" that "detailed and specific" information provided to them in "pitch decks" by plaintiff's former employee constituted trade secrets acquired by improper means. 778 F. Supp. 3d 264, 278, 294 (D. Mass. 2025). Likewise, in *Neural Magic, Inc. v. Meta Platforms, Inc.*, the court found a triable issue of fact as to whether a technology company "knew or had reason to know" that algorithms it obtained from a competitor's former employee were "acquired by improper means" when "non-disclosure agreements are industry standard, so [the defendant] at least should have known that many of its new hires were subject to such agreements." 659 F. Supp. 3d 138, 158, 181–82 (D. Mass. 2023). This Court, too, has recognized that

"reason to know" may be inferred from circumstances that would put a sophisticated party "on notice of an improper acquisition" of trade secrets. *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1189 (9th Cir. 2018) (triable issue existed where the defendant paid far below "market rate," used an atypical acquisition method, and had "prior experience" suggesting "constructive knowledge that the data it obtained were acquired through improper means").

Other cases are in accord. *See, e.g., Elko, Inc. v. WTH Com. Servs., LLC*, 2023 WL 6141623, at *6 n.5 (D. Nev. Sept. 20, 2023) (denying motion to dismiss DTSA claim because defendant "knew or should have known that information … was improperly acquired" given that confidentiality policies are "relatively standard" in the industry, and the information was of a "type … that [plaintiff] would not voluntarily disclose" to a competitor); *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1056 (N.D. Cal. 2020) (declining to dismiss DTSA claim and observing that defendant "knew or should have known that the allegedly shared information was being passed along" by plaintiff's employee in violation of confidentiality obligations, especially when defendant had previously signed a confidentiality agreement himself and thus "should have

known" that plaintiff's employee "maintained a like agreement"); *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, 2016 WL 11523446, at *3 (C.D. Cal. Oct. 17, 2016) (plaintiff "plead[ed] sufficient facts to infer that [defendant] knew or had reason to know that the information it acquired from [plaintiff's] customers were trade secrets that were disclosed in breach of a duty of confidentiality to [plaintiff]" via allegations that information was stamped "Proprietary"). Like the plaintiffs in these cases, xAI plausibly alleged that OpenAI knew or should have known it was acquiring trade secrets that were improperly disclosed.

#### 3. The district court was wrong to conclude otherwise.

The district court's reasons for holding xAI's allegations insufficient to plead misappropriation do not withstand scrutiny.

The court stated that the allegations were "not sufficient to plausibly infer that it was obvious to OpenAI engineers that the information disclosed was an xAI trade secret." ER-8. Without questioning that Li's slide deck contained trade secrets, the court claimed that "the level of detail included in the slide deck is unclear" and that "[i]t is not clear at what level of detail Li discussed" the trade secrets during his interview presentation. ER-8.

These assertions are difficult to understand. As described above, xAI alleged that Li's presentation went into a sufficient level of detail to disclose xAI's trade secrets. Specifically, xAI (1) alleged that "during this presentation, Li shared with OpenAI confidential trade secrets about xAI's products and model training"; (2) summarized the information revealed on each slide of the deck, which OpenAI engineers were specifically "focused on" in their own work and "would have [had] the technical background necessary" to recognize as valuable and protected trade secrets; and (3) explained that given the "prevalence of confidentiality agreements in the AI industry," OpenAI engineers knew or should have known that Li was breaching contractual confidentiality obligations by disclosing this information. ER-90–91 ¶ 71(a)–(d).

xAI also plausibly alleged that "[i]t is well understood in the AI industry that the type of information reflected in Li's slide deck constituted highly confidential and highly valuable trade secret information." ER-90–91 ¶ 71(a); *see also* ER-91 ¶ 71(b) (explaining how the information Li conveyed "would have been directly relevant to the interviewers' own work in studying how to improve OpenAI's reinforcement learning," so they "would have known the value of the

information that [Li] was communicating"). Once the court credited xAI's allegations that Li disclosed that type of information in his presentation, it should also have credited the allegation that OpenAI's engineers knew or should have known that Li's disclosures were improper. *See* ER-90–91 ¶¶ 71(a)–(b), 72; *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("In assessing the allegations holistically … , the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

It is not clear what more the district court believed xAI should have alleged. To be sure, xAI was not actually present in the meeting when Li disclosed the trade secrets. But at the motion-to-dismiss stage, it is an eminently reasonable inference that Li discussed the trade secrets in at least the level of detail reflected in the slide deck he had prepared for his interviews, which the SAC alleged was sufficiently detailed both to disclose xAI trade secrets and to put OpenAI's engineers on notice that the disclosure was improper. *See Ahern Rentals*, 59 F.4th at 956 (district court erred in dismissing misappropriation claim supported by allegations pleaded "on information and belief" when "hard evidence" was

"within the [defendant's] sole control," so plaintiff could "prove [its] culpability only through discovery").

If anything, the allegations support an inference that Li, over the course of his multi-day series of interviews, likely went into even greater detail than what is apparent on the face of the slide deck. *See* ER-89–90 ¶¶ 65–70 (describing OpenAI's highly "technical" interview process, which asks candidates to present a "detailed examination about lessons learned, alternatives considered, scaling insights, and more" from their "prior project[s]"); ER-92 ¶ 72 (describing the "standard practice in the AI industry that interview candidates will orally provide much more detailed information regarding the materials reflected in their interview slides," which makes it "likely" that "[Li] revealed even more detailed information and additional trade secrets beyond the face of the slides"); ER-96–97 ¶ 100 (explaining that Li invoked the Fifth Amendment when asked whether he had shared xAI trade secrets with OpenAI); *see also* Complaint ¶ 9, *Liu*, No. 5:26-cv-07078, Dkt. 1 (Apple similarly alleging that OpenAI "elicit[s] … Apple confidential information" during candidates' interviews). But regardless, the slide deck alone is sufficient to make xAI's misappropriation claim plausible.

Assessing xAI's allegations about the slide deck itself, the court found that "the 'confidential' label on [its] first page" did not provide "a sufficient basis" to infer that OpenAI knew or should have known that the information constituted xAI trade secrets. ER-8–9. It claimed that doing so would require "rejecting" multiple "obvious alternative explanation[s]"—that Li merely used the slide deck as notes and did not present it to the OpenAI interviewers, that the interviewers "could reasonably have understood any 'confidential' label to refer to the nondisclosure agreement between Li and OpenAI," and that the interviewers "could reasonably have lacked sufficient information to deduce that any xAI information labeled as 'confidential' was a trade secret as opposed to merely sensitive." ER-8–9. But these supposed "alternative explanations" are far from obvious, especially in light of the totality of xAI's allegations concerning the slide deck, the context in which it was presented, and the lengths to which Li went to delete any evidence of its existence. Li specifically prepared the slide deck for use over multi-day interviews in which he provided detailed, technical explanations of his work and contributions at xAI to engineers who would have understood, based on industry norms and their own specialized

expertise in the field, that the information contained xAI trade secrets subject to confidentiality protections. *See* ER-89–92 ¶¶ 65–72. The slide deck's "confidential" label was just one of the many aspects of Li's presentation that would have put OpenAI interviewers on notice that Li was disclosing xAI trade secrets.

The district court also erred by suggesting that xAI needed to allege more "active conduct" by OpenAI. ER-10. Throughout both of its orders, the district court focused on whether OpenAI "induced" or "encouraged" xAI's employees to disclose trade secrets. *See* ER-117, 120, 124–25; ER-6–7. The court stated that "[e]ven if xAI sufficiently alleged OpenAI's knowledge" that Li was improperly disclosing xAI's trade secrets in his presentation to OpenAI, that would not suffice to state a claim under the DTSA because it would allege only "passive receipt" of trade secrets by OpenAI and not "active conduct." ER-10.

That framing of the DTSA's statutory requirements for establishing liability was incorrect. The district court's active-versus-passive dichotomy relied on dicta from a state court decision interpreting California's trade secret law on a question even that court considered "academic" on the facts before it. *See Silvaco Data Sys. v. Intel Corp.*, 184

Cal. App. 4th 210, 223 (2010) ("We need not decide the outer limits of acquisition as contemplated by CUTSA," and "the mental state required for actionable acquisition appears to be academic."). But nothing in the DTSA requires active inducement or encouragement. Instead, the DTSA requires only acquisition (coming into possession) of a trade secret by one who knows or has reason to know that the acquisition was by improper means. *See* 18 U.S.C. § 1839(5)(A); *JustMed*, 600 F.3d at 1129. And courts have warned that overly restrictive interpretations of the DTSA, such as the district court adopted here, would deny "trade secret owners a fair opportunity to prove misappropriation." *Oakwood Labs.*, 999 F.3d at 910 (rejecting "a cramped definition of 'use'" under the DTSA).

The district court appeared to think that its atextual "inducement" requirement was necessary to cabin DTSA liability as a policy matter. It assumed that without such a requirement, the DTSA would "expose employers to liability any time they inquire about a candidate's past work," which the court considered "a routine part of the hiring process." ER-6.

The court's concern was unwarranted. The DTSA's "knows or has reason to know" element, § 1839(5)(A), obviates any concern that

employers will be held liable for truly innocent or inadvertent conduct, making it unnecessary to graft an additional scienter requirement onto the statute that is found nowhere in its text. *Cf. Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200–01 (4th Cir. 2001) (per curiam) ("merely looking at information acquired inadvertently" does not constitute acquisition with knowledge that trade secret was obtained through improper means).

Nor is there any danger that employers will incur liability for asking job candidates "routine" questions about their work history. Contrary to the district court's suggestion, OpenAI's interview process is not "routine," and it does not simply "inquire about a candidate's past work" in general terms. ER-6. Rather, OpenAI specifically structures its multi-day interviews to include "technical deep dive[s]" that solicit information about "technical aspects" of a "prior project" and "the candidate's specific contributions." ER-89 ¶ 66.

This targeted solicitation of detailed technical information is uniquely problematic from a trade secret standpoint, making the district court's concerns about overly expansive liability unwarranted. In fact, the district court's holding creates its own slippery slope problems,

providing a roadmap for unscrupulous competitors to avoid liability for misappropriation even when they strategically engage candidates likely to possess valuable trade secrets, signal their receptiveness to receiving those trade secrets, then knowingly accept their disclosure during the hiring process.[2]

In any event, even assuming some level of encouragement or inducement was required, xAI's allegations here suffice. The district court correctly noted that "if OpenAI knew or should have known that Li had disclosed xAI's trade secrets in his presentation," then allegations that OpenAI "show[ed] continued interest in [Li's] candidacy even after he revealed xAI trade secrets … could potentially demonstrate inducement." ER-7. xAI sufficiently alleged both OpenAI's knowledge

[2] Employers well understand that when they interview candidates about their past work, they have a responsibility to proceed carefully so as not to elicit any disclosure of trade secrets. *See, e.g.,* Thomas J. Gray & Peter O'Rourke, *Preventing Employee Trade Secrets Misuse from Derailing Your Company*, 132 I.P. Couns. Art. I (2007) (employers must "train [their] employees on how to interview prospective employees," including "how to learn important information about the prospective employee's work experiences … without intentionally or unintentionally eliciting trade secret information"); Scott F. Gibson, *Important Considerations: Conducting a Trade Secret Audit*, 53 No. 2 DRI For Def. 36 (2011) (interviewers should "reiterate[]" that "[t]he candidate should not disclose any trade secrets or confidential information of others during the interview process").

and its continued interest in Li's candidacy. Despite having received trade secrets from Li under circumstances that it knew or should have known were improper, OpenAI offered Li a job worth "multiple millions of dollars" and did not withdraw that job offer until after xAI filed suit against Li and obtained a temporary restraining order to prevent him from working at OpenAI. *See* ER-94, 96 ¶¶ 83, 98–99.

The SAC also alleged other "active conduct" by OpenAI that encouraged and facilitated Li's improper disclosure of xAI's trade secrets. For example, in the days after Li's interview, the OpenAI recruiter, Tifa Chen, sent Li multiple disappearing chats on an encrypted messaging app, one of which included a link to, upon information and belief, a cloud storage location. ER-92–93 ¶ 75. *The very next day*, Li uploaded "the entire xAI source code base—the crown jewel of xAI's trade secrets"—and "an internal xAI slide deck providing an in-depth overview of the infrastructure for the same reinforcement[-]learning training framework that Li disclosed in his interview" to a separate cloud account that OpenAI could access. ER-93 ¶¶ 76–78 (emphasis omitted). Just a few hours later, Chen sent Li another encrypted message that equated to "no way!" and the two quickly entered a virtual meeting. ER-93–94 ¶¶ 80–

81. And in the following days, Li again downloaded xAI's confidential information to his laptop, and Chen subsequently communicated to him OpenAI's multi-million-dollar employment offer. ER-94 ¶¶ 82–83. Taken together, these allegations plausibly establish that OpenAI misappropriated xAI's trade secrets through Li.

### B. xAI sufficiently alleged that the Li presentation was part of a broader campaign of misappropriation by OpenAI.

The Court does not need to parse out the various allegations of misappropriation by OpenAI to reverse the dismissal below. The SAC pleads a single claim of misappropriation under the DTSA. *See* ER-109–13 ¶¶ 156–83. Because the allegations regarding the Li presentation support that claim, the motion to dismiss should have been denied. *See Redd v. Guerrero*, 84 F.4th 874, 892 (9th Cir. 2023) ("[O]nce a claim has been stated adequately, it may be supported by showing *any* set of facts consistent with the allegations in the complaint." (emphasis added) (alteration in original) (quoting *Twombly*, 550 U.S. at 563)); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("To survive a motion to dismiss, a [] plaintiff need only provide *enough facts* to state a

claim to relief that is plausible on its face." (emphasis in original) (quotation marks omitted)).

Even so, xAI plausibly alleged that OpenAI's relationship with Li was just one facet of a wider campaign to acquire xAI's trade secrets. At the same time OpenAI was courting Li, and within a period of just a few weeks, OpenAI poached at least seven other xAI employees with specialized expertise related to xAI's proprietary generative AI technology and data centers. ER-108–09 ¶ 155. Several of those former employees then stole, or attempted to steal, xAI's confidential information.

Notably, around the same time as Li's thefts, another former xAI engineer, Jimmy Fraiture, stole the most valuable and sensitive portions of xAI's infrastructure and training code, including code related to Grok 4. ER-99, 100 ¶¶ 113, 118–20. And like Li, he did so while engaging in encrypted communications with the very same OpenAI recruiter. ER-99, 102 ¶¶ 115, 127. Fraiture now works for OpenAI in London. ER-101 ¶ 124. The FBI seized both Fraiture's and Li's devices "as part of an ongoing criminal investigation into their conduct." ER-74 ¶ 3.

This broad-ranging data theft is remarkable. To its knowledge, xAI has never had even one employee steal source code of this volume or value before, let alone two at the same time. ER-102 ¶ 129. The fact that multiple employees stole source code and other confidential materials within a short period of time while engaging in encrypted communications with the same recruiter from a competing AI company is highly suspicious and cannot be written off as mere coincidence. The "alarming pattern" outlined in the SAC "can only lead to one conclusion: OpenAI has turned to these unscrupulous and illegal tactics to fend off a highly innovative challenger in AI." ER-108–09 ¶ 155. At minimum, that is a plausible inference at the motion-to-dismiss stage.

What is more, Fraiture and Li were not outliers. A former finance executive whom OpenAI hired specifically for his experience with xAI's data centers (another aspect of xAI's "secret sauce") has since shared highly confidential information with OpenAI. ER-102–05 ¶¶ 131, 135–37, 142. At least one other employee involved with xAI's data centers tried to access xAI's confidential information after departing for OpenAI through a link to which he improperly retained access. ER-107–08 ¶ 153. And two other former xAI employees recruited by OpenAI retained

confidential information after their departure and subsequently refused requests to turn over their devices or identify the information they had retained. ER-107 ¶ 150.

A holistic, common-sense reading of these allegations lends further support to the misappropriation claim. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007) (courts "must consider the complaint in its entirety"—their "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) (courts must deploy both "judicial experience and common sense" to evaluate allegations' plausibility on a motion to dismiss (quoting *Iqbal*, 556 U.S. at 679)). The allegations showing that OpenAI improperly acquired xAI's trade secrets from Li reinforce and strengthen the allegations that OpenAI engaged in similar conduct with other xAI employees, and vice versa. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14–15 (1st Cir. 2011) ("[T]he district court erred when it failed to evaluate the cumulative effect of the factual allegations … Indeed, the Supreme Court has suggested that allegations that would individually lack the heft to make a claim plausible may suffice to state

a claim in the context of the complaint's other factual allegations." (citing *Twombly*, 550 U.S. at 557)).

The district court gave short shrift to the allegations regarding former xAI employees other than Li. In its initial dismissal order, the court concluded that "[w]ithout more," these allegations did not plead a plausible misappropriation claim. *See* ER-124; *see* ER-125, 126–28. And its second dismissal order ignored these allegations altogether. *See generally* ER-5–11. That was wrong.

Because "[m]isappropriation and misuse can rarely be proved by convincing direct evidence," *Oakwood Labs.*, 999 F.3d at 913 (quotation marks omitted), "[r]eliance on circumstantial evidence can be especially warranted in showing trade secret misappropriation," where "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place," *Wisk Aero*, 2021 WL 8820180, at *10 (quotation marks omitted). "In analyzing misappropriation, the inquiry focuses on all of the threads of its allegations woven together—the 'whole gestalt' of the complaint or evidence—not each in isolation." *Id.* at *11 (quotation marks

and citation omitted). But here, the district court parsed the SAC's individual allegations and "asked for direct proof of misappropriation, without permitting the discovery essential to uncovering the evidence for proper consideration of the merits." *Oakwood Labs.*, 999 F.3d at 913. The district court "erroneously applied a heightened pleading standard" to xAI's misappropriation claim, and this Court should reverse. *Id.*

## II. At Minimum, xAI Should be Granted the Opportunity to Amend Its Complaint.

The district court compounded its error by denying xAI leave to amend its complaint. Rule 15 requires that leave to amend be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[T]he Supreme Court has instructed the lower federal courts to heed carefully th[is] command." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quotation marks omitted).

The district court did not adequately explain why amendment would be futile here. *See* ER-11. For example, the court complained that there was insufficient "detail" regarding the Li presentation to support an inference that OpenAI knew Li was disclosing xAI's trade secrets, and it noted that xAI had not submitted a copy of Li's slide deck with the complaint. ER-8 & n.3. xAI believes its allegations regarding Li's

presentation were sufficient. But if more were required, xAI could have amended the complaint to attach a copy of the slide deck and to provide additional detail about why the slide deck supports an inference that Li improperly disclosed xAI's trade secrets and that OpenAI knew or should have known he was doing so—just as the district court suggested.

Leave to amend was also proper in light of ongoing "discovery in other litigation," which the district court expressly acknowledged. ER-11. Parallel proceedings against Li have already uncovered evidence that supports xAI's misappropriation claim here, including the presentation Li gave to OpenAI interviewers and Li's subsequent invocation of the Fifth Amendment when asked whether that presentation disclosed xAI trade secrets. *See, e.g.*, ER-77, 89–92, 96–97 ¶¶ 11–12, 66–73, 100. In addition, while this appeal was pending, xAI finally obtained third-party discovery from OpenAI in the *Li* litigation (though only after months of obstruction by OpenAI forced xAI to file a successful motion to compel). *See* Order, *Li*, No. 3:25-cv-07292 (N.D. Cal. Apr. 29, 2026), Dkt. 130. OpenAI's confidential production on August 14, 2026, confirms many of the allegations in the SAC. xAI expects that as the *Li* case proceeds, xAI

will uncover additional supportive evidence that could have been used in an amended complaint here.

## CONCLUSION

The district court erred in dismissing xAI's complaint, and this Court should reverse.

Respectfully submitted,

*/s/ Paul Alessio Mezzina*

Paul J. Watford
KING & SPALDING LLP
633 W 5th Street, Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Mark Zambarda
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
mzambarda@kslaw.com

Martha Banner Banks
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600
bbanks@kslaw.com

LeElle B. Slifer
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
lslifer@kslaw.com

Paul Alessio Mezzina
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com

August 24, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 26-4486

The undersigned attorney or self-represented party states the following:

- (●) I am unaware of any related cases currently pending in this court.
- ( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.
- ( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/Paul Alessio Mezzina **Date** Aug 24, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4486

I am the attorney or self-represented party.

**This brief contains** 10,788 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ____________.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Paul Alessio Mezzina **Date** 08/24/2026
*(use "s/[typed name]" to sign electronically-filed documents)*