**No. 26-4486**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**X.AI CORP., X.AI LLC,**
***Plaintiffs-Appellants*,**

v.

**OPENAI, INC., OPENAI GLOBAL, LLC, AND OPENAI OPCO, LLC,**
***Defendants-Appellees*.**

*On Appeal from the United States District Court for the Northern District of California, Case No. 3:25-cv-08133-RFL, Judge Rita F. Lin*

# ANSWERING BRIEF OF DEFENDANTS-APPELLEES

Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, D.C. 20001

Carolyn Hoecker Luedtke
Miriam Kim
Gabriel M. Bronshteyn
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Carolyn.Luedtke@mto.com

*Counsel for Defendants-Appellees OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC*

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUE ........ 4

PERTINENT STATUTORY PROVISIONS ........ 4

STATEMENT OF THE CASE ........ 4

A. xAI's Allegations ........ 5

1. Xuechen Li ........ 5

2. Other Individuals ........ 8

B. xAI's Three Complaints, Its Motion to Stay, and the District Court's Orders ........ 10

1. The Initial Complaint ........ 10

2. The First Amended Complaint ........ 11

3. xAI's Motion to Stay ........ 12

4. The Second Amended Complaint ........ 14

SUMMARY OF THE ARGUMENT ........ 16

STANDARD OF REVIEW ........ 18

ARGUMENT ........ 19

I. xAI Failed to State a Claim for Misappropriation Against OpenAI. ........ 19

A. xAI's Allegations About Li's Interview Do Not Plausibly State a Claim That OpenAI Misappropriated Trade Secrets. ........ 20

1. xAI Did Not Plausibly Allege That OpenAI Knew or Should Have Known That Li Disclosed a Trade Secret. ........ 21

2. xAI Did Not Plead Any Acquisition by OpenAI. ........ 32

**TABLE OF CONTENTS**
**(Continued)**

**Page**

a. xAI's Allegations of Li's Unilateral Disclosure Do Not Establish Statutory Acquisition by OpenAI. ....................................33

b. xAI Does Not Plausibly Allege That OpenAI Engaged in Conduct Directed at Obtaining xAI's Trade Secrets. ............................44

B. xAI's Remaining Conjectural Allegations Do Not Save Its Deficient Misappropriation Claim. .....................................48

1. Considered Individually, xAI's Allegations About Other Employees Fall Far Short of Pleading Misappropriation by OpenAI. .......................................48

2. The "Gestalt" of the Allegations Does Not Create a Reasonable Inference of Misappropriation. ...................51

II. The District Court Did Not Abuse Its Discretion in Denying xAI a Third Opportunity to Amend Its Complaint. ............................56

CONCLUSION ..........................................................................................60

STATEMENT OF RELATED CASES ...............................................................61

CERTIFICATE OF COMPLIANCE ................................................................62

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ABC Acquisition Co., LLC v. AIP Prods. Corp.*,
2020 WL 4607247 (N.D. Ill. Aug. 11, 2020) ....................35

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
711 F. Supp. 3d 873 (M.D. Tenn. 2024) ....................41, 46

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................5, 19, 23, 27, 58

*ATS Prods., Inc. v. Champion Fiberglass, Inc.*,
2013 WL 6086924 (N.D. Cal. Nov. 19, 2013) ....................35

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
2016 WL 11523446 (C.D. Cal. Oct. 17, 2016) ....................28

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*,
289 F.3d 589 (9th Cir. 2002) ....................59

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................18, 19, 23, 29, 58

*Bus. Sols. LLC v. Ganatra*,
2020 WL 1279209 (C.D. Cal. Jan. 22, 2020)....................35

*Carr v. AutoNation Inc.*,
2018 WL 288018 (E.D. Cal. Jan. 4, 2018) ....................27, 28

*CellMark, Inc. v. Webster*,
2025 WL 1426825 (E.D. Ky. May 16, 2025)....................35

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ....................23

*CFTC v. Monex Credit Co.*,
931 F.3d 966 (9th Cir. 2019) ....................22, 23

*Chodos v. W. Publ'g Co.*,
292 F.3d 992 (9th Cir. 2002) ....................57

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020)....................................................31, 32

*City of Los Angeles v. Barr*,
941 F.3d 931 (9th Cir. 2019) ....................................................................33

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) ..................................................................56

*Cohen v. ConAgra Brands, Inc.*,
16 F.4th 1283 (9th Cir. 2021) ....................................................................19

*Dirks v. SEC*,
463 U.S. 646 (1983)....................................................................................38

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ..............................................................18, 23, 56

*Election Integrity Project Cal., Inc. v. Weber*,
113 F.4th 1072 (9th Cir. 2024) ..................................................................58

*Elko, Inc. v. WTH Comm. Servs., LLC*,
2023 WL 6141623 (D. Nev. Sept. 20, 2023)..............................................31

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024) ...............................................................56, 57

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
893 F.3d 1176 (9th Cir. 2018) ............................................................30, 31

*G.B. ex rel. G.P. v. EPA*,
172 F.4th 1042 (9th Cir. 2026) ..................................................................55

*Genentech, Inc. v. JHL Biotech, Inc.*,
2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) ..............................................28

*In re Hernandez*,
2011 WL 3300927 (B.A.P. 9th Cir. Jan. 5, 2011)........................................35

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. 580 (2026) ........................................................................ 19, 23, 29

*Huddleston v. United States*,
415 U.S. 814 (1974) ........................................................................ 39

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ........................................................ 25, 39

*JustMed, Inc. v. Byce*,
600 F.3d 1118 (9th Cir. 2010) ...................................................... 37, 39, 40

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................................ 19, 25

*Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*,
616 F.3d 963 (9th Cir. 2010) ........................................................ 27

*Luvdarts, LLC v. AT&T Mobility, LLC*,
710 F.3d 1068 (9th Cir. 2013) ...................................................... 27

*Mujica v. AirScan, Inc.*,
771 F.3d 580 (9th Cir. 2014) ........................................................ 57, 58

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ...................................................... 51

*Navigation Holdings, LLC v. Molavi*,
445 F. Supp. 3d 69 (N.D. Cal. 2020) ............................................. 21, 27

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
659 F. Supp. 3d 138 (D. Mass. 2023) ............................................ 30

*NLRB v. Valley Health Sys., LLC*,
93 F.4th 1115 (9th Cir. 2024) ....................................................... 36

*Oakwood Lab'ys LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021) .......................................................... 39, 52

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Pie Dev., L.L.C. v. Pie Carrier Holdings, Inc.*,
128 F.4th 657 (5th Cir. 2025) .......... 21

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
149 F.4th 1081 (9th Cir. 2025) .......... 49, 50

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) .......... 26

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) .......... 59

*Source Production & Equipment Co. v. Schehr*,
2017 WL 3721543 (E.D. La. Aug. 29, 2017) .......... 41, 42

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 37, 38

*United States v. Smith*,
155 F.3d 1051 (9th Cir. 1998) .......... 39

*United States v. Weber*,
923 F.2d 1338 (9th Cir. 1990) .......... 32

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723 (9th Cir. 2019) .......... 38

*Walgreen Co. v. Haseotes*,
778 F. Supp. 3d 264 (D. Mass. 2025) .......... 29, 30

*Whitaker v. Tesla Motors, Inc.*,
985 F.3d 1173 (9th Cir. 2021) .......... 57

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) .......... 51, 52, 53, 54

## TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**STATE CASES**

*Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*,
186 Cal. Rptr. 3d 486 (Cal. Ct. App. 2015)....................53

*Hooked Media Grp., Inc. v. Apple Inc.*,
269 Cal. Rptr. 3d 406 (Cal. Ct. App. 2020)....................37, 49

*Silvaco Data Sys. v. Intel Corp.*,
109 Cal. Rptr. 3d 27 (Cal. Ct. App. 2010).................... 2, 15, 34, 35, 39, 40, 45

**FEDERAL STATUTES**

18 U.S.C. § 1832....................35, 36, 37

18 U.S.C. § 1832(a)(1)....................36

18 U.S.C. § 1832(a)(2)....................36

18 U.S.C. § 1832(a)(3)....................36, 37

18 U.S.C. § 1839....................35, 36, 37

18 U.S.C. § 1839(5)....................19, 21, 33

18 U.S.C. § 1839(5)(A)....................20, 36, 41

18 U.S.C. § 1839(5)(B)....................36, 37

18 U.S.C. § 1839(6)....................21

18 U.S.C. § 1839(6)(A)....................21

**FEDERAL RULES**

Fed. R. Civ. P. 8....................58

Fed. R. Civ. P. 12(b)(6)....................55

Fed. R. Evid. 201(b)....................25

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**CONSTITUTIONAL PROVISION**

U.S. Const. amend. V ........................................................................41

**OTHER AUTHORITIES**

Black's Law Dictionary (6th ed. 1990) ..........................................................34

Judith Humphrey, *Elon Musk Asks All Job Candidates This One Question*, Fast Company (Feb. 27, 2020), https://tinyurl.com/5bndhrd9 ..........................................................22

Leslie Pack Kaelbling et al., *Reinforcement Learning: A Survey*, 4 J. Artificial Intelligence Rsch. 237 (1996) ..........................................................25

Elon Musk (@elonmusk), X (Mar. 12, 2026, at 02:06 PT), https://tinyurl.com/4a234r8p..........................................................5

1 Oxford English Dictionary (2d ed. 1989) ..........................................................34, 35

Restatement (Third) of Unfair Competition § 43 cmt. b, illus. 4 ............................42

Alexander Saeedy, *Elon Musk's Grok Chatbot Publishes Series of Antisemitic Posts*, Wall St. J. (July 8, 2025)..........................................................4

Webster's New World College Dictionary (5th ed. 2014) .......................................33

Webster's Third New International Dictionary (2002) ..........................33, 34, 39, 40

xAI, *Grok 4* (July 9, 2025), https://x.ai/news/grok-4 ..............................................25

xAI, *Grok 4 Model Card* (Aug. 20, 2025), https://data.x.ai/2025-08-20-grok-4-model-card.pdf..........................................................25

## INTRODUCTION

The Defend Trade Secrets Act ("DTSA") provides a private right of action for three statutory acts of trade secret misappropriation: the knowing acquisition, disclosure, or use of another's trade secrets. xAI sued OpenAI for misappropriation. But rather than focusing on any actions by OpenAI, across three complaints and briefing on two motions to dismiss, xAI levied various accusations against xAI's former employees. As the district court rightly concluded, none of those allegations "point to any misconduct by OpenAI," ER-117, and certainly no statutory acquisition, disclosure, or use of xAI's trade secrets by OpenAI. xAI's opening brief amplifies that defect: xAI focuses on what its former employees did, but xAI does not and cannot plausibly allege any way in which OpenAI misappropriated trade secrets.

On appeal, xAI focuses on allegations that its former employee, Xuechen Li, divulged its trade secrets when purportedly presenting about his past work during an interview with OpenAI. Here too, xAI seeks to transmute *Li*'s alleged misconduct into an act of misappropriation by *OpenAI*. That effort fails for two reasons.

First, even assuming this alleged presentation occurred, xAI did not plausibly allege that OpenAI knew or should have known that Li disclosed xAI's trade secrets, as required under the DTSA. xAI alleged that Li disclosed unspecified content of a slide deck during an OpenAI interview. But despite having that deck, xAI chose not

to attach a copy of the presentation to its Second Amended Complaint, opting instead to describe the slide deck in general terms and alleging no details indicating that Li discussed anything but matters of general knowledge in the artificial intelligence field during his interview. As xAI elsewhere acknowledged, the interview slides themselves "demonstrate" that Li "repackaged information in such a way to attempt to mask that the information he shared included or derived from xAI trade secrets." SER-23.

xAI's allegations about Li's interview presentation fail for a second, independent reason: xAI never alleged any act of statutory acquisition by OpenAI. xAI contorts the DTSA, arguing that Li's alleged unilateral disclosure constitutes an act of "acquisition" by OpenAI. It does not: As courts to consider the issue have consistently recognized, the DTSA requires an act of "acquisition," i.e., "pointed conduct intended to secure dominion" over the trade secret. *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 40 (Cal. Ct. App. 2010). xAI's interpretation lacks comparable support. And it stretches the statute to unthinkable extremes, extending liability to anyone knowingly exposed to a third party's unilateral disclosure of trade secrets. This Court should reject that unprecedented construction.

The facts alleged here illustrate the point. xAI did not allege that OpenAI solicited Li to disclose trade secrets, or even that OpenAI asked Li to present about

his work at xAI. xAI alleged that *Li* prepared a slide deck, that *Li* discussed its contents, and that Li's interviewer heard him do so. That does not suffice.

Backpedaling, xAI urges the Court to consider the "whole gestalt" of its individually deficient allegations, arguing that it pled a "broader campaign of misappropriation by OpenAI" based on its allegations that OpenAI "poached" several of its employees, some of whom allegedly retained xAI's information. OB.49-50, 53. But piling one deficient allegation on top of another does not somehow create a viable claim of misappropriation. Hiring employees seeking to leave a competitor is legal; that is all OpenAI did. Whether considered individually or together, xAI's allegations about its former employees demonstrate no misconduct by OpenAI, much less that OpenAI acquired, used, or disclosed xAI's trade secrets through them.

The district court was right not to permit xAI a fourth chance to state a claim. xAI did not fix the deficiencies in its complaint because it could not fix them. That much is clear from xAI's ongoing efforts to obtain discovery to "gather the evidence necessary to make its claims," SER-33—first in inappropriately seeking a stay of proceedings after dismissal of its First Amended Complaint, and now in seeking reversal for leave to amend to pursue further discovery. "xAI was required to have completed its investigation of its claims *before* filing suit, *not after*." ER-11 (citation modified). Because xAI does not have "the requisite information to allege its

claims," it "should not have sued OpenAI." ER-11. The judgment should be affirmed.

## STATEMENT OF JURISDICTION

OpenAI agrees with xAI's statement of jurisdiction.

## STATEMENT OF THE ISSUE

Whether the district court correctly dismissed xAI's complaint with prejudice for failure to plausibly allege that OpenAI knowingly acquired xAI's trade secrets, as required to state a claim for misappropriation under the Defend Trade Secrets Act.

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

xAI and OpenAI are technology companies that, among other things, develop generative artificial intelligence models. xAI's product is called "Grok." ER-83 ¶ 39. OpenAI's product, ChatGPT, is the world's leading AI assistant, with hundreds of millions of users. ER-83 ¶ 38.

In July 2025, xAI launched Grok 4. ER-89 ¶ 63. That release did not cause xAI to overtake OpenAI. Instead, it coincided with an exodus of talent from xAI to other companies, as Grok unleashed antisemitic tirades online[1] and lagged competing products to the point that Elon Musk himself eventually acknowledged

[1] Alexander Saeedy, *Elon Musk's Grok Chatbot Publishes Series of Antisemitic Posts*, Wall St. J. (July 8, 2025), https://tinyurl.com/44aadrpx.

that "xAI was not built right first time around, so is being rebuilt from the foundations up." Elon Musk (@elonmusk), X (Mar. 12, 2026, at 02:06 PT), https://tinyurl.com/4a234r8p. In an effort to stop the bleeding, xAI filed this suit, publicly naming and shaming many of its departing former employees—even those for whom xAI offered no concrete allegations of wrongdoing. *See* ER-105-106 ¶ 143; ER-206. xAI accused OpenAI of misappropriating its trade secrets, filing three successive complaints against OpenAI.

### A. xAI's Allegations

#### 1. Xuechen Li

From the beginning, xAI focused on allegations that Xuechen Li, an xAI engineer, downloaded xAI's source code before leaving xAI. Li was offered a position at OpenAI, but never worked there. ER-96 ¶ 99.[2]

Although xAI alleged that Li transferred its source code to a personal account, xAI never alleged that Li transferred any code to OpenAI. *See* ER-93 ¶ 76. xAI instead alleged that OpenAI "induced" Li to download the code, and insinuated (without alleging) that OpenAI could have acquired the code. ER-92 ¶ 74. To

[2] In addressing xAI's allegations, this brief omits conclusory allegations—for example, that OpenAI "directed, instructed, financially rewarded, and/or otherwise encouraged [former xAI employees] to steal or otherwise misappropriate xAI's Confidential Information and trade secrets." ER-111 ¶ 170. Those allegations "are no more than conclusions" and are therefore "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

intimate there was a transfer of the code, xAI emphasized recruiting communications between Li and an OpenAI recruiter, alleging that Li received a link to a "cloud storage location" from the recruiter. ER-92-93 ¶ 75. xAI took care not to allege the nature of the link—including whether it was a portal for HR-related paperwork, or whether it was even configured to allow Li to upload anything. *See* ER-142. Nor did xAI allege that Li uploaded any source code to the "cloud storage location" that OpenAI sent to him. ER-92-93 ¶¶ 75-76. Instead, xAI alleged only that, the next day, Li uploaded the source code to a "personal cloud account," and then onto his personal laptop. ER-93 ¶¶ 76, 79.

Stretching further, xAI alleged that Li's personal cloud storage account was linked to his personal, consumer ChatGPT account, and thus OpenAI theoretically "had a means to access Li's [personal] files." ER-97 ¶ 102. xAI did not allege that Li uploaded source code to ChatGPT, much less that OpenAI accessed anything in his personal account.

xAI also alleged that, on the same day that Li downloaded xAI's source code, OpenAI's recruiter sent Li a message that "equated to 'no way!'" ER-93 ¶ 80. As the district court observed, "xAI does not allege what prompted [the recruiter] to send Li this message," ER-118-119, despite apparently having a copy of the messages. And as xAI "clarified in its opposition brief and at oral argument," the

message "actually read 'nw!'" (i.e., an abbreviation that is often used to mean "no worries!"). ER-119; SER-73 n.3.

xAI focuses now on allegations that Li disclosed xAI information to OpenAI during an alleged interview presentation. xAI alleged, "[o]n information and belief," that OpenAI asks job candidates to "deliver a presentation about a prior project." ER-89 ¶ 66. xAI did not allege that OpenAI asked Li to deliver such a presentation. *See* ER-89 ¶ 67 (assuming, but not alleging, a request). xAI alleged that Li created a slide deck titled "interview slides 07-13-25" around the time he was interviewing with OpenAI that was labeled "confidential" on its first page, and that, "[o]n information and belief," he had presented it, "either visually or by verbally sharing the contents" during his interviews with OpenAI. ER-89-91 ¶¶ 68, 71(c). xAI's allegations make clear that it did not know whether or to what extent Li discussed the contents of the presentation during his interviews with OpenAI. ER-89-90, 92 ¶¶ 68, 72. OpenAI has denied that Li made this presentation. ER-57; SER-114 ¶ 51.

xAI described at a general level, but did not include, the contents of this presentation in its Second Amended Complaint ("SAC"). ER-90-91 ¶ 71. xAI opted not to include the presentation as an exhibit to its SAC, despite having a copy at the time. ER-59; SER-13-14. In fact, it was OpenAI that pointed the district court to a copy of the presentation (which xAI had filed before Judge Lin in a related action it had brought against Li ("the Li Litigation")) in arguing that OpenAI would not have

known that its contents were confidential. ER-58, 67. OpenAI also sought judicial notice of xAI's motion to compel in the Li Litigation, wherein xAI had argued that OpenAI would *not* be able to reliably recognize what was "xAI information"; that the "slides demonstrate" that "Li may have repackaged information in such a way to attempt to mask that the information he shared included or derived from xAI trade secrets"; that Li "attempt[ed] to disguise his use of xAI confidential information in the interview slides"; and that it took an xAI engineer reviewing the slides to ascertain whether they reflected "xAI information" because, even to xAI's "in-house and outside counsel, it was not entirely apparent from the face of the document." SER-9, 13, 23. xAI never mentions those admissions in its opening brief.

#### 2. Other Individuals

Each iteration of xAI's complaint also collected allegations about other former xAI employees hired by OpenAI—allegations involving markedly different conduct and, for the most part, no alleged communications with OpenAI concerning the information at issue.

***Fraiture.*** xAI alleged that Jimmy Fraiture downloaded source code while working at xAI to his personal computer, and then told xAI he had deleted that code from his personal device before beginning work at OpenAI. ER-100-101 ¶¶ 117-118, 123. xAI did not allege that Fraiture maintained possession of the code upon

joining OpenAI, much less that he transferred the source code to OpenAI or used it in his work at OpenAI.

***Knight and Pham.*** xAI alleged that Ethan Knight and Hieu Pham kept unspecified xAI information on their personal devices after departing xAI, that they have not returned all such material to xAI, and that they provided copies of that information to an unnamed third party. ER-107 ¶¶ 150-152. xAI did not allege that either Knight or Pham still possesses any xAI confidential information, that either transferred such information to OpenAI, or any nonconclusory facts indicating that either used such information at OpenAI. xAI also took care to avoid identifying the unnamed third party to whom Knight and Pham provided copies of that information. ER-139; SER-102 ¶ 4 (OpenAI counsel declaring that unnamed third party was forensics vendor retained by counsel to remove xAI information from Knight's and Pham's personal devices).

***Ruddarraju.*** xAI alleged that Uday Ruddarraju attempted to—but did not—access an allegedly confidential xAI document from a Google Drive link while employed at OpenAI. ER-107-108 ¶ 153.

***Finance Executive.*** xAI alleged that OpenAI hired a senior finance executive for a role related to data centers. ER-103-104 ¶ 137. xAI inferred that he and OpenAI committed misappropriation because OpenAI hired the executive despite him allegedly lacking experience with data centers before working at xAI, and

because he used profane language in responding to outreach from xAI representatives after joining OpenAI. ER-104-105 ¶¶ 139-141. After the district court found those allegations inadequate, xAI added allegations that the executive disclosed xAI information related to "executive compensation," "business deals," and "financial practices and strategies" to OpenAI. ER-105 ¶ 142. xAI did not allege the specific information allegedly disclosed, to whom it was disclosed or under what circumstances, or how or whether the recipient would know it was confidential or from xAI.

***Other Former Employees.*** xAI repeatedly named two other former employees who joined OpenAI and accused them of being willing to "flout[]" their confidentiality obligations, despite never alleging they engaged in any wrongdoing beyond exercising their right to change employers. *See, e.g.*, ER-80, 105-107 ¶¶ 20, 143, 149.

### B. xAI's Three Complaints, Its Motion to Stay, and the District Court's Orders

#### 1. The Initial Complaint

xAI filed its initial complaint ("Complaint") on September 24, 2025, bringing, as relevant, a claim of trade secret misappropriation under the DTSA. ER-210. xAI focused its allegations on Li, Fraiture, and the finance executive, but did not name any individual defendants. ER-210. This suit was related to the Li Litigation before Judge Lin. ER-209.

OpenAI moved to dismiss the Complaint, arguing that xAI failed to state a claim for misappropriation against OpenAI because it had not alleged that *OpenAI* acquired or used xAI trade secrets. ER-194. OpenAI subsequently answered the Complaint. SER-103.

### 2. The First Amended Complaint

Rather than defend its allegations, xAI filed a First Amended Complaint ("FAC"), adding allegations concerning Knight, Pham, and Ruddarraju. ER-155, 184. OpenAI again moved to dismiss. ER-132.

In its opposition, xAI made clear that its core theory was that OpenAI had "directed xAI's former employees to steal xAI's trade secrets." SER-88 (capitalization omitted); *see also* SER-86-87. xAI's inducement theory was that even if OpenAI had not itself acquired, disclosed, or used xAI's trade secrets, OpenAI was liable for encouraging others to misappropriate. SER-94. xAI advanced an alternative theory that its allegations raised an inference that OpenAI acquired and used the trade secrets that Li allegedly stole from xAI. SER-94-95. And xAI pressed a third theory, contending that OpenAI was vicariously liable for its employees' misappropriation. SER-96.

The district court dismissed the complaint with leave to amend, concluding that "xAI does not point to any misconduct by OpenAI." ER-117 ("Notably absent are allegations about the conduct of OpenAI itself."). Addressing xAI's core theory,

the court held that "xAI offers no nonconclusory allegations that permit a reasonable inference of inducement." ER-124. As to xAI's alternative argument that OpenAI acquired or used trade secrets Li disclosed during his interview, the court concluded that xAI had not alleged any "facts that permit a reasonable inference that OpenAI knew that the information was a trade secret, that Li had improperly acquired the information, or that Li was improperly or mistakenly disclosing the information." ER-125. The court also rejected xAI's vicarious liability theory, evaluating xAI's allegations about each former employee in detail and concluding that xAI failed to allege that any OpenAI employee had used xAI trade secrets at OpenAI. ER-127-128.

The court then took care to evaluate xAI's allegations "as an amalgamated whole." ER-130; *see also* ER-124. The court concluded that, "even when taken together, as true, and with all reasonable inferences drawn in favor of xAI, the allegations do not support a plausible inference that xAI's former employees used its trade secrets in their work at OpenAI." ER-130; *see also* ER-124-125.

The court provided xAI leave to amend the complaint to "correct[] the deficiencies identified in this Order." ER-131.

#### 3. xAI's Motion to Stay

Rather than amending its complaint, xAI moved for a stay of proceedings. SER-54. xAI argued that it needed a stay "so that it may obtain the evidence it needs

to assert its claims," contending that it would attempt to obtain that evidence by pursuing third-party discovery from OpenAI in its separate cases against Li and Fraiture. SER-32. Recognizing that the district court had dismissed its complaint for "insufficiently pleading a link" between any misappropriation and OpenAI's conduct, xAI argued that further discovery "may well 'illuminate' the link to OpenAI." SER-61. xAI also argued that it had "identified new information" confirming OpenAI's knowledge. SER-57. As OpenAI explained in opposition, this supposedly "new" information was the slide deck Li prepared—a slide deck that xAI had in its possession for several months. SER-43-44.

The court denied the stay. SER-32. As the court explained, "xAI was required to have completed its investigation of its claims *before* filing suit, *not after*, and if it lacked the requisite information to allege its claims in the manner required when it filed suit, it should not have sued OpenAI in the first instance." SER-33 (citation modified). Although xAI had invoked judicial efficiency in asking for a stay, the district court reasoned that "[t]here is nothing efficient about plaintiffs filing lawsuits without conducting the required investigations and then later staying those cases to permit belated investigations." SER-33.

### 4. The Second Amended Complaint

xAI filed a Second Amended Complaint ("SAC"). ER-73. In the SAC, xAI focused on developing its allegations regarding Li's purported interview presentation. ER-89-92 ¶¶ 66-73. OpenAI again moved to dismiss. ER-51.

The court again granted the motion, this time with prejudice. ER-5. As the court recognized, xAI's SAC advanced two theories: "(1) OpenAI induced xAI's then-employee Li to misappropriate xAI's trade secrets; and (2) Li disclosed xAI's trade secrets to OpenAI in a presentation that he delivered during the recruitment process." ER-5. As to inducement, the court explained that xAI was "[i]n essence . . . equat[ing] asking a candidate about their prior work experience with encouraging the candidate to divulge trade secrets." ER-6. The court reasoned that questions about prior work were "a routine part of the hiring process" and "d[id] not allow a plausible inference that OpenAI induced Li to reveal anything confidential or secret about that work." ER-6. To infer misappropriation from OpenAI's alleged practice of asking candidates about prior projects would, the court held, "potentially expose employers to liability any time they inquire about a candidate's past work." ER-6.

The court rejected xAI's theory that OpenAI had acquired trade secrets that Li had allegedly disclosed for two independent reasons. First, the court concluded that xAI had not pled allegations "[]sufficient to support a reasonable inference that

OpenAI knew or should have known that Li disclosed xAI trade secrets during his presentation." ER-8. The court noted that xAI had "refrain[ed] from alleging that Li actually displayed the slide deck during his presentation," but "even assuming that he did so, the level of detail included in the slide deck is unclear." ER-8. After all, the court noted, xAI opted not to "file a copy of the slide deck with the SAC." ER-8 n.3. The court also rejected xAI's argument that the "confidential" label on the first page supports an inference of OpenAI's knowledge that Li's purported disclosure was improper, explaining that it "relies on a multi-step inferential chain," each step "involv[ing] rejecting an obvious alternative explanation," including "that the OpenAI engineers could reasonably have understood any 'confidential' label to refer to the nondisclosure agreement between Li and OpenAI." ER-8-9.

Second, the court held that xAI's disclosure theory also failed because "xAI alleges only passive receipt of trade secrets by OpenAI" and "[c]ourts interpret acquisition under the DTSA to require active conduct." ER-10. As the court explained, "[o]ne does not ordinarily 'acquire' a thing inadvertently; the term implies conduct directed to that objective." ER-10 (quoting *Silvaco*, 109 Cal. Rptr. 3d at 40). And, the court noted, "were passive receipt enough, that would run dangerously close to imposing liability for the mere possession of trade secrets," which "is not sufficient to constitute misappropriation." ER-10.

The court dismissed the SAC without leave to amend. The court concluded that xAI had "failed to cure the deficiencies identified in the Prior Order," and that "further amendment would be futile." ER-11. The court cited xAI's effort to stay the case to pursue evidence supporting its claims, emphasizing that "xAI was required to have completed its investigation of its claims *before* filing suit." ER-11 (citation omitted). The court also noted that "xAI has already been provided multiple opportunities to state a valid claim." ER-11.

## SUMMARY OF THE ARGUMENT

I. xAI failed to state a claim for misappropriation against OpenAI. xAI did not plausibly allege that OpenAI acquired, used, or disclosed xAI's trade secrets, as required for a DTSA claim against OpenAI.

A. xAI's allegations that Li disclosed xAI trade secrets during an OpenAI interview presentation fail to plausibly state a claim for misappropriation for two independent reasons.

First, xAI failed to allege facts showing that OpenAI knew or should have known that Li disclosed trade secrets in breach of a duty of secrecy. xAI chose not to attach a copy of the presentation to its complaint, and its generalized descriptions of the presentation raise no reasonable inference that its content would have alerted OpenAI's interviewers that Li had crossed the line from discussing work experience in terms familiar to experts in the field to divulging specific xAI trade secrets. That

deficiency is illustrated by xAI's own admission in a related case that Li "attempt[ed] to disguise his use of xAI confidential information in the interview slides." SER-23.

Second, Li's alleged unilateral disclosure of trade secrets in the presence of OpenAI interviewers does not constitute a statutory act of "acquisition" by OpenAI. "Acquisition" connotes affirmative conduct directed toward obtaining a trade secret, rather than mere knowing exposure to a third party's unilateral disclosure. Congress chose to impose civil misappropriation liability for "acquisition," rather than passive "receipt" or "possession" of trade secrets. Courts to consider the question have thus consistently interpreted "acquisition" to involve "pointed conduct intended to secure dominion" over the trade secret. xAI's unprecedented interpretation lacks such support. And it produces absurd results, subjecting to misappropriation liability anyone knowingly exposed to an unsolicited disclosure of trade secrets.

Here, xAI alleged no conduct by OpenAI directed at obtaining xAI's trade secrets. xAI's conjectural allegations about Li's job offer and communications with an OpenAI recruiter show only that OpenAI recruited Li, and supply no facts supporting a reasonable inference that OpenAI took any steps to acquire xAI's trade secrets.

B. xAI's allegations about its other former employees do not establish a broader campaign of misappropriation by OpenAI. xAI asks the Court to squint at

its other allegations rather than parse them, and to draw connections between them that simply do not exist. But as the district court correctly concluded, the throughline of xAI's scattered allegations, whether considered individually or collectively, is that they do not "point to any misconduct by OpenAI." ER-117.

II. The district court did not abuse its discretion in denying xAI leave to file a fourth complaint. xAI had three opportunities to plead a viable claim and xAI was on clear notice of the essential deficiencies in its allegations, but it did not and could not fix them. xAI now proposes to attach a copy of the slide deck to its complaint, but xAI already had a copy of the presentation before amending the complaint and *chose* not to include its contents in the record before the district court. And xAI's hope that discovery in the separate Li Litigation will finally hand it plausible allegations supplies no basis for yet another amendment. xAI was required to investigate its allegations before filing its complaint.

xAI supplies no reason to expect that a fourth complaint will succeed where its first three failed. The judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss *de novo*. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face"—to "raise a right to relief above

the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). If the complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). To plausibly state a claim, "a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. 580, 589-90 (2026) (citations omitted). In judging the plausibility of a plaintiff's allegations, the court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

This Court reviews the denial of leave to amend for abuse of discretion and the futility of amendment de novo. *See Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1287 (9th Cir. 2021).

## ARGUMENT

### I. xAI Failed to State a Claim for Misappropriation Against OpenAI.

The DTSA imposes liability for three discrete acts of "misappropriation": the knowing "acquisition," "use," or "disclosure" of another's trade secrets. 18 U.S.C. § 1839(5). The statute defines misappropriation under an acquisition theory as the

"acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1839(5)(A).

xAI advances two arguments on appeal that OpenAI misappropriated its trade secrets through acquisition. First, xAI argues that OpenAI improperly acquired xAI's trade secrets when Li allegedly discussed them when interviewing at OpenAI. But, as the district court correctly concluded, xAI failed to plausibly allege either (1) that OpenAI knew or should have known that Li was disclosing trade secrets through the unextraordinary discussion of his past work experience in a job interview, or (2) that OpenAI committed an act of "acquisition" of trade secrets when it allegedly heard Li discussing them. Second, xAI contends that it alleged a broader campaign by OpenAI aimed at acquiring its trade secrets. But xAI cannot defend the adequacy of its scattered individual allegations about its other former employees, and considering them together does nothing to support a reasonable inference of misconduct by *OpenAI*.

### A. xAI's Allegations About Li's Interview Do Not Plausibly State a Claim That OpenAI Misappropriated Trade Secrets.

xAI focuses this appeal on its allegations on information and belief that Li disclosed xAI trade secrets during an interview presentation with OpenAI. Those allegations do not state a claim for misappropriation for two independent reasons: they do not raise a reasonable inference that OpenAI had the requisite knowledge for liability, and they do not plead an act of statutory "acquisition" by OpenAI.

### 1. xAI Did Not Plausibly Allege That OpenAI Knew or Should Have Known That Li Disclosed a Trade Secret.

The district court correctly concluded that dismissal was required because xAI failed to plead that OpenAI knew or should have known that Li was divulging trade secrets in allegedly discussing a slide deck during his interview. ER-10-11. The DTSA's scienter requirement demands that a defendant "knows or has reason to know that the trade secret was acquired by improper means," which includes the breach "of a duty to maintain secrecy." 18 U.S.C. § 1839(5), (6)(A). As courts have recognized, a defendant must know or have reason to know both that the information in question is a trade secret and that it was acquired through improper means. *See Pie Dev., L.L.C. v. Pie Carrier Holdings, Inc.*, 128 F.4th 657, 664 (5th Cir. 2025).

Applied here, xAI must show that OpenAI knew or should have known that Li's presentation contained trade secrets and that Li was disclosing them in "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6); *see* OB.35. That requires xAI to allege more than *its* view that the slides contained proprietary information. The question is whether *OpenAI* knew or should have known that Li disclosed trade secrets in violation of a duty of secrecy. That requires "factual substantiation," not mere "conclusory assertion[s]" of OpenAI's knowledge. *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 79 (N.D. Cal. 2020) (Koh, J.). Here, to the extent that xAI even pled that Li disclosed information from his slide deck to OpenAI, xAI

did not plead a factual basis to support a reasonable inference of OpenAI's knowledge that Li disclosed trade secrets.

a. First, the context here is important. Li allegedly discussed information about his work at xAI during an interview. It is perfectly natural for a candidate to discuss prior work experiences during an interview to demonstrate qualifications and problem-solving skills. Doing so is a sensible way for an employer to determine the quality and relevance of a candidate's experience.[3] It is also standard for candidates to engage in those discussions while respecting confidentiality obligations that restrict what they may reveal. As xAI acknowledged, confidentiality agreements are "prevalen[t]" in the AI industry, and so "Li's OpenAI interviewers" would "have understood that, when Li was delivering his presentation," he was subject to "contractual confidentiality duties to xAI." ER-91 ¶ 71(d).

Given that context, it is not reasonable to infer from allegations that Li discussed his work experience in an interview that OpenAI engineers should have leapt to concluding he was divulging trade secrets. *See CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) (court must "draw on its judicial experience and common sense" in performing the "context-specific task" of evaluating reasonable

[3] Tellingly, xAI's CEO himself personally asks "all job candidates" to "[t]ell me about some of the most difficult problems you worked on and how you solved them," down to the "little details." Judith Humphrey, *Elon Musk Asks All Job Candidates This One Question*, Fast Company (Feb. 27, 2020), https://tinyurl.com/5bndhrd9.

inferences (quoting *Iqbal*, 556 U.S. at 679)). The reasonable expectation in any interview is that a candidate will describe her experience—for example, relevant technical experience—while respecting the confidentiality obligations everyone understands apply. A law firm interviewing a prospective associate would not jump to assuming that her discussion of her prior work violated attorney-client privilege; a hospital interviewing a doctor would not immediately conclude that her description of her clinical experience violated her patient confidentiality obligations. Without something more—a red flag that a candidate has gone too far—an employer would expect that a candidate's discussion of past work appropriately navigates industry-standard confidentiality obligations. So too here: It is not reasonable to infer that Li's alleged discussion of his prior work experience would have raised trade-secret alarm bells for OpenAI. *See Eclectic Props.*, 751 F.3d at 996-99 (*Iqbal* requires facts that plausibly distinguish alleged wrongdoing from facially legitimate, routine commercial conduct); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (allegations consistent with mutually exclusive culpable and lawful explanations require "something more" tending to exclude the lawful explanation); *Hikma Pharms.*, 608 U.S. at 592 (dismissing allegations as implausible where "standard industry practice" supplied "obvious alternative explanation" (quoting *Twombly*, 550 U.S. at 567)).

b. xAI tries to show "something more" that would have tipped OpenAI off to potential trade secrets by gesturing at the content of the presentation, but its allegations are fatally thin. Even assuming Li presented information from the slides (which he did not), "the level of detail included in the slide deck is unclear." ER-8. That is not, as xAI complains, because "'hard evidence' is 'within the sole control'" of OpenAI. OB.32-33 (citation omitted); *see also, e.g.*, OB.34. Instead, the absence of detail about the slide deck is the result of xAI's own litigation strategy. xAI had a copy of Li's slide deck from its forensic inspection of his computer well before filing the SAC. SER-13-14. That is how xAI can selectively quote the presentation. But xAI *chose* not to attach that deck to its SAC—even though it redacted other information from that filing and even after the district court had concluded that the FAC "allege[d] no facts that permit a reasonable inference that OpenAI knew that the information" in the presentation "was a trade secret" or "that Li was improperly . . . disclosing the information." ER-125; ER-8 n.3; *see also* ER-260 (xAI filed redacted and under seal SAC). As a result of that strategic choice to withhold the presentation from the record, xAI is left with generalized descriptions of the slides paired with conclusory assertions about OpenAI's knowledge, which do not satisfy its pleading burden.

xAI's high-level description of the slides' contents does not create a reasonable inference that Li disclosed anything so obviously proprietary to xAI that

OpenAI would have or should have recognized it as a trade secret. For example, xAI emphasizes that the presentation "focused specifically on xAI's reinforcement learning techniques" and Grok 4, OB.11 (quoting ER-91 ¶ 71(b)), but allegations of those generalized topics do not raise a reasonable inference that OpenAI should or would have known Li disclosed trade secrets. "Reinforcement learning" is a decades-old technique for training artificial intelligence systems.[4] And xAI itself alleged that Grok 4's release was "widely publicized" and that "industry commentators . . . attributed Grok 4's success to reinforcement-learning-related innovations." ER-89, 91 ¶¶ 63, 71(b). Indeed, *xAI* publicized the "techniques" by which it had "scale[d] up reinforcement learning" in announcing Grok 4 *before* Li's interview. xAI, *Grok 4* (July 9, 2025), https://x.ai/news/grok-4.[5] Without alleging further detail about the presentation, xAI fails to identify anything that should have made his interviewers recognize that he had discussed anything but "matters of general knowledge in the trade." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020).

---

[4] *See, e.g.*, Leslie Pack Kaelbling et al., *Reinforcement Learning: A Survey*, 4 J. Artificial Intelligence Rsch. 237, 237-85 (1996).

[5] *See also* xAI, *Grok 4 Model Card* (Aug. 20, 2025), https://data.x.ai/2025-08-20-grok-4-model-card.pdf (discussing "reinforcement learning techniques," including "human feedback, verifiable rewards, and model grading—along with supervised finetuning of specific capabilities"). This Court may take judicial notice of this public information for the fact of xAI having made such statements, which is "not subject to reasonable dispute." Fed. R. Evid. 201(b); *Khoja*, 899 F.3d at 998-99 (judicially noticed material may be considered in ruling on motion to dismiss).

xAI's own filing illustrates why the high-level descriptions in its complaint are insufficient to infer OpenAI's knowledge that Li disclosed trade secrets. In its motion to compel in the Li Litigation, xAI explained that the interview slides "demonstrate" that Li "repackaged information in such a way to attempt to mask that the information he shared included or derived from xAI trade secrets," and that Li "disguise[d] his use of xAI confidential information in the interview slides."[6] SER-23. Apparently, it took review by an xAI engineer to determine "precisely what sort of information contained within those slides constituted xAI's information since, to xAI's in-house and outside counsel, it was not entirely apparent from the face of the document." SER-13.[7] As that filing shows, even a discussion of "xAI's reinforcement learning techniques" and "Grok 4," OB.11, that *did* include trade secrets could be presented in a way to prevent someone from recognizing that any proprietary details were being discussed. That problem is compounded by xAI's failure to allege what, if anything, Li actually showed or said to his interviewers: as

---

[6] This Court should take judicial notice of these filings, for which OpenAI sought judicial notice in the district court in moving to dismiss the SAC. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (granting judicial notice of various filings from a related case because this Court "may take judicial notice of court filings and other matters of public record"); *see* SER-28.

[7] Although xAI further speculated that OpenAI engineers would have recognized the slides as relating to "xAI's model training frameworks," SER-23, recognizing that information concerns a company's work is not the same as recognizing that it constitutes protected trade secrets. On xAI's own account, the interview slides attempted to disguise the latter.

xAI recognized, Li "may have passed off" xAI "proprietary details" "as his own personal knowledge or invention (*e.g.*, as relating to his academic research work from before he started working at xAI)." SER-23.

Lacking details, xAI resorts to conclusory assertions about how OpenAI would have viewed the deck, assuming it was presented. xAI claims that "[i]t is well-understood in the AI industry that the type of information reflected in Li's slide deck constituted highly confidential and highly valuable trade secret information." ER-90-91 ¶ 71(a). But that is precisely the sort of conclusory allegation that this Court may disregard. *See Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 969 (9th Cir. 2010) (dismissing allegations of defendant's knowledge made "in a conclusory fashion," where plaintiff pled no specific facts "suggesting that [defendants] had a reason to suspect the falsity of the statements made by the victim"); *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) ("conclusory allegations that the [defendants] had the required knowledge" were "plainly insufficient" under *Iqbal*); *Navigation Holdings*, 445 F. Supp. 3d at 79 (conclusory assertion "devoid of any factual substantiation of Defendants' knowledge" warranted dismissing trade secret misappropriation claim); *Carr v. AutoNation Inc.*, 2018 WL 288018, at *3 (E.D. Cal. Jan. 4, 2018) (dismissing misappropriation claim for failure to allege "what specifically would have caused

[defendant] to know or have reason to know that [another company]'s possession of the Business Plan was wrongful").

xAI tries to overcome these deficiencies by pointing to its allegation that the first slide of the presentation was labeled "confidential." ER-91 ¶ 71(c). That too fails. xAI did not allege that Li presented the slides visually as opposed to verbally, much less that Li displayed the first slide, so there is no indication that anyone from OpenAI saw this label. *See* ER-89-90 ¶ 68. Even if they had, xAI's allegations do not support a reasonable inference that OpenAI would or should have concluded from a "confidential" label that Li decided to present *xAI* confidential information to OpenAI during an interview despite being subject to an xAI confidentiality agreement. *Contrast Genentech, Inc. v. JHL Biotech, Inc.*, 2019 WL 1045911, at *12 (N.D. Cal. Mar. 5, 2019) (confidentiality marker supported allegations of knowledge where it said "GENENTECH Pharm R & D Technical Report – CONFIDENTIAL"); *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, 2016 WL 11523446, at *1, *3 (C.D. Cal. Oct. 17, 2016) (inferring knowledge where the defendant company obtained "technical work papers" that featured "legend[s] identifying the material as proprietary" specifically to the plaintiff). Here, xAI does not allege the slide said "xAI Confidential" or anything to that effect. Thus, xAI's allegations do nothing to "rule out" the "obvious alternative explanation" that OpenAI would have understood the label to refer to the confidentiality of the

interview process itself, considering Li was bound by an NDA with OpenAI with respect to his recruitment. *See Hikma Pharms.*, 608 U.S. at 590 (quoting *Twombly*, 550 U.S. at 567); ER-94 ¶ 86.

In short, the most that can be reasonably inferred from xAI's complaint is that, accepting its allegations as true, Li discussed information related to slides pertaining to his work at xAI during an interview with OpenAI. That is not enough to plausibly establish that OpenAI knew or should have known that Li disclosed xAI's trade secrets.

c. Without factual allegations on its side, xAI leans into cases (almost all from district courts) in which knowledge was adequately pleaded or supported by the evidentiary record. *See* OB.37-39. But those cases only underscore the comparative deficiency of xAI's allegations: unlike here, each involved concrete circumstances giving the defendant reason to know that it was receiving improperly obtained information.

Walgreen Co. v. Haseotes, 778 F. Supp. 3d 264 (D. Mass. 2025): As xAI emphasizes, *Walgreen* involved "pitch decks," OB.37, but the similarities to this case end with the word "deck." There, defendants acquired illegally obtained "pitch decks" drawn from "tens of thousands" of stolen Walgreens files that documented the private financial data of stores nationwide. 778 F. Supp. 3d at 277-78; *see id.* at 294. The defendants were "specifically informed" that the information "was illicitly

obtained through the misappropriation of Walgreens' trade secrets." *Id.* at 278. xAI's allegations do not come close to showing such specific and obviously confidential details, nor does xAI allege that Li told OpenAI that he was providing xAI's trade secrets.

*Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138 (D. Mass. 2023): In *Neural*, the court mentioned Meta's likely knowledge of the confidentiality agreement of the employee it hired away, *see* OB.37, but also emphasized that the employee immediately wrote code for Meta implementing his former employer's trade secret algorithms, told Meta that he performed similar work for his former employer, and that Meta did not discipline him after the plaintiff informed Meta of the alleged misappropriation. 659 F. Supp. 3d at 155-56, 181-82. xAI does not allege anything similar regarding Li working at OpenAI—*because Li never worked at OpenAI*.

*Experian Info. Sols., Inc. v. Nationwide Marketing Services Inc.*, 893 F.3d 1176 (9th Cir. 2018): Like *Neural*, *Experian* involved objective red flags of trade secret misappropriation: the defendant "paid less than 1% of the market rate for a one-time license to obtain actual ownership" of certain data, through an invoice structure that was "unusual in the industry." *Id.* at 1189; *see also id.* (noting that plaintiff "submitted evidence of [defendant's] President's prior experience that should have put him on notice of an improper acquisition"). Although those facts

were sufficient to "indicate knowledge" that the data was acquired improperly, no such "unusual" circumstances exist here. *Id.* Li's alleged discussion of his work experience would be the norm in any interview, and so would not put OpenAI "on notice" that he had breached a duty of secrecy.

*Elko, Inc. v. WTH Commercial Services, LLC*, 2023 WL 6141623 (D. Nev. Sept. 20, 2023): Contrary to xAI's suggestion, *see* OB.38, *Elko* does not infer knowledge from standard industry confidentiality agreements alone. Instead, the plaintiff alleged that the defendant and employee entered an agreement to steal confidential information, that the employee materially increased the volume of emails and documents he sent to his personal email, and that the defendant later used the confidential customer information to target plaintiff's customers. 2023 WL 6141623, at *5-6 & n.5. The court described those allegations as "not factually robust" but, nonetheless, "taken together" they were enough to allege a "purposeful, *mutually-agreed-upon* acquisition" of stolen materials "followed by disclosure." *Id.* at *6. xAI's allegations are even less "robust," *id.*, as xAI points only to (speculative) allegations of Li's conduct, and nothing to support any "agreement" with or use by OpenAI.

*Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024 (N.D. Cal. 2020): *Cisco* involved a months-long "scheme" of documented written exchanges of confidential information between the defendant's employee (Puorro) and the plaintiff's employee

(Williams), wherein Puorro would ask Williams to "[d]ig for" confidential information, and Williams would provide it. *Id.* at 1055-56. The court emphasized that it was reasonable to infer knowledge both because Puorro and Williams repeatedly suggested discussing confidential information by phone and because Puorro was, himself, a former employee of the plaintiff and therefore should have known of the informant's confidentiality obligations. *See id.* at 1055-56. Far from a give-and-take documented in writing, xAI has a one-sided presentation about which it alleged remarkably few details.

In sum, xAI's allegations do not come close to plausibly demonstrating OpenAI's knowledge. Even setting aside xAI's position that Li prepared the slides in a way that "mask[ed]" and "disguise[d] his use of xAI confidential information," SER-23, the inferences xAI asks the Court to draw about OpenAI's knowledge are individually implausible, and more implausible still when stacked together. "[W]ith each succeeding inference, the last reached is less and less likely to be true." *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990).

**2. xAI Did Not Plead Any Acquisition by OpenAI.**

xAI's claim of misappropriation suffers from a second, independent flaw: xAI does not plausibly allege that OpenAI committed an act of "acquisition" of xAI's trade secrets. xAI's misappropriation theory concerning Li's slide deck is that OpenAI "acquired [xAI's] trade secrets when Li disclosed them." OB.24. But the

DTSA does not subject bystanders to misappropriation liability for a third party's disclosure of trade secrets. xAI did not allege that OpenAI took any steps to acquire the trade secrets Li allegedly unilaterally disclosed, and its allegations about Li communicating with an OpenAI recruiter and receiving a job offer supply no reasonable inference that OpenAI induced him to divulge xAI's trade secrets.

**a. xAI's Allegations of Li's Unilateral Disclosure Do Not Establish Statutory Acquisition by OpenAI.**

In its brief in this Court, xAI's central argument is that OpenAI misappropriated xAI's trade secrets because Li allegedly disclosed those trade secrets during his interview. As xAI puts it, "Li disclosed, and OpenAI thus acquired (came into possession of), xAI's trade secrets." OB.35. The DTSA's text and structure make clear that the statute does not impose liability for the mere status of being subjected to a third party's disclosure of trade secrets.

i. This Court begins statutory analysis with a statute's text. *See City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019). The DTSA imposes liability for the knowing "acquisition of a trade secret of another." 18 U.S.C. § 1839(5). Because the statute does not define "acquisition," that term takes its plain meaning. *See City of Los Angeles*, 941 F.3d at 940. "Acquisition" is generally defined as "an acquiring," and "acquire," in turn, means "to get or gain by one's own effort." *Acquisition*, *Acquire*, Webster's New World College Dictionary 12 (5th ed. 2014); *see also, e.g.*, *Acquisition*, *Acquire*, Webster's Third New International Dictionary

18-19 (2002) (defining "acquisition" as "the act or action of acquiring"; defining "acquire" as "to come into possession, control or power of disposal of often by some uncertain or unspecified means"); *Acquisition*, *Acquire*, Black's Law Dictionary (6th ed. 1990) (defining acquisition as "the act by which one acquires"; defining acquire as "[t]o gain by any means, usually by one's own exertions"). Acquisition thus typically connotes conduct directed toward obtaining possession or control—i.e., not simply receiving something because of the unilateral effort or choices of someone else.

Although the ordinary meaning of "acquisition" can also sometimes include more passive receipt, that is not the most natural reading of the term. The California Court of Appeal's decision in *Silvaco Data Systems v. Intel Corp.*, 109 Cal. Rptr. 3d 27 (Cal. Ct. App. 2010), is instructive in this regard. *Silvaco* interpreted language identical to the DTSA contained in California's trade secret act. *See id.* at 35-36.[8] As *Silvaco* explained, "[t]o acquire a thing is, most broadly, to 'receive' or 'come into possession of it.'" *Id.* at 40 (quoting 1 Oxford English Dictionary 115 (2d ed. 1989)). But, as the court continued, "the term implies more than passive reception; it implies pointed conduct intended to secure dominion over the thing, i.e., '[t]o gain, obtain, or *get as one's own*, to gain the ownership of (by one's own exertions or

[8] The DTSA's definition of misappropriation is "identical[] in all relevant respects" to the Uniform Trade Secrets Act definition on which both the California and federal trade secret acts were modeled. S. Rep. No. 114-220, at 10-11 (2016).

qualities).'" *Id.* (quoting 1 Oxford English Dictionary 115 (2d ed. 1989)). Someone who obtains a box of chocolates is most naturally said to "acquire" them when she purchases them herself, but to "receive" them when they arrive as an unsolicited gift. Likewise, someone who learns information is most naturally said to "acquire" it when she takes affirmative steps to seek it out, but to "receive" or "hear" it when another person volunteers it without solicitation. Recognizing that ordinary usage, *Silvaco* reasoned that it had to give effect to "[t]he choice of ['acquire'] over 'receive'" and accordingly concluded that "one who passively receives a trade secret, but neither discloses nor uses it, would not be guilty of misappropriation." *Id.* Courts that have considered whether passive receipt alone constitutes "acquisition" have consistently followed *Silvaco*'s distinction between acquisition and passive receipt.[9]

The statutory context here further confirms *Silvaco*'s insight that "acquire" should not be read to cover mere passive receipt. A neighboring section of the same statutory chapter containing the misappropriation definition criminalizes the "[t]heft of trade secrets." 18 U.S.C. § 1832. Like Section 1839's definition providing for

[9] *See, e.g.*, *Bus. Sols. LLC v. Ganatra*, 2020 WL 1279209, at *6 (C.D. Cal. Jan. 22, 2020); *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 2013 WL 6086924, at *3 (N.D. Cal. Nov. 19, 2013); *In re Hernandez*, 2011 WL 3300927, at *5 (B.A.P. 9th Cir. Jan. 5, 2011); *ABC Acquisition Co., LLC v. AIP Prods. Corp.*, 2020 WL 4607247, at *11 (N.D. Ill. Aug. 11, 2020); *see also CellMark, Inc. v. Webster*, 2025 WL 1426825, at *8 (E.D. Ky. May 16, 2025).

civil liability, Section 1832 imposes liability for certain uses and disclosures of trade secrets. *See id.* §§ 1832(a)(1)-(2), 1839(5)(B). And both provisions cover certain ways of gaining access to trade secrets. *See id.* §§ 1832(a)(3), 1839(5)(A). Critically, however, Congress used different language in specifying the conduct that would give rise to liability under the two provisions: While the civil misappropriation statute provides for a cause of action for the "acquisition" of trade secrets, the criminal theft statute provides for liability where someone "receives, buys, or possesses" a trade secret. *Id.* § 1832(a)(3).[10] Because Congress "employ[ed] different language in related sections of [the] statute," this Court "presume[s] these 'differences in language convey differences in meaning.'" *NLRB v. Valley Health Sys., LLC*, 93 F.4th 1115, 1119 (9th Cir. 2024) (citation and alteration omitted). Giving that difference effect means reading "acquisition" in its ordinary sense as connoting effort or conduct directed toward obtaining something, not merely passively receiving it.

The contrast between those two statutory sections confirms that reading for a second reason. Section 1832, the criminal theft statute, expressly reaches a person who "possesses" a trade secret with requisite knowledge and intent to convert. 18

[10] Section 1832 pairs its coverage of a broader range of conduct with a substantially more demanding mens rea, including an "intent to convert [the] trade secret" to another's "economic benefit" and "inten[t] or know[ledge] that the offense will[] injure" the trade secret's owner. 18 U.S.C. § 1832.

U.S.C. § 1832(a)(3). Section 1839 does not: As this Court made clear in interpreting materially identical language in Idaho's uniform trade secrets statute, possession of a trade secret—even possession maintained wrongfully—is not itself an "acquisition." *See JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 & n.8 (9th Cir. 2010); *see also Hooked Media Grp., Inc. v. Apple Inc.*, 269 Cal. Rptr. 3d 406, 414 (Cal. Ct. App. 2020) ("[M]ere possession of information is not enough to establish improper acquisition of a trade secret."). Possession gives rise to liability under Section 1839 only upon a defendant's downstream "use" or "disclosure" of the trade secret. *JustMed*, 600 F.3d at 1129; 18 U.S.C. § 1839(5)(B). Congress thus expressly criminalized culpable possession in Section 1832, while omitting possession from the acts constituting civil misappropriation under Section 1839. That reflects a choice to distinguish between the state of possessing information (for which only Section 1832 imposes liability), and the act of improperly acquiring that information (which both provisions address). Reading "acquisition" to be distinct from mere possession—to require conduct directed toward obtaining possession or control—avoids collapsing that distinction.

That reading also sensibly avoids stretching misappropriation liability to the point of absurdity, subjecting any knowing recipient of a third party's unilateral disclosure of trade secrets to DTSA liability. "[O]ur legal system generally does not impose liability for mere omissions, inactions, or nonfeasance." *Twitter, Inc. v.*

*Taamneh*, 598 U.S. 471, 489 (2023); *see also Dirks v. SEC*, 463 U.S. 646, 654-56 (1983) (rejecting insider trading tippee liability for "knowing[] recei[pt]" of nonpublic market information); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019) (requiring "volitional conduct" to establish causation for direct copyright infringement and distinguishing between "active and passive participation" in the infringement (citation omitted)). Just as someone "who passively watche[s] a robbery" does not aid and abet that crime, *Twitter*, 598 U.S. at 489, so too does it make little sense to impose liability on someone who is passively exposed to a trade secret. *See Dirks*, 463 U.S. at 663 (emphasizing the need to focus on "what [insiders] do rather than on policing information *per se* and its possession" (citation and alteration omitted)). The contrary rule would be untenable: Attendees at a conference who hear a speaker disclose trade secrets while acknowledging that he violated an NDA would violate the DTSA by being in the room. Recipients of an email from a disgruntled employee featuring obviously stolen engineering specifications would violate the DTSA by opening their inbox. And as relevant here, any interviewer asking routine questions about a candidate's prior experience would face misappropriation liability if the candidate unilaterally chose to divulge confidential details. That is not the law.

ii. xAI presents very little to explain its interpretation of the statute. It begins by arguing that "[a]cquire means 'to come into possession, control, or power of

disposal of,'" relying on *JustMed*. OB.28 (quoting *JustMed*, 600 F.3d at 1129 (quoting Webster's Third New International Dictionary)). As explained, "acquire" *can*, in its broadest sense, refer simply to gaining possession, but that is neither the most natural reading of the word generally, nor one that fits the statute's context specifically. *See* pp. 33-38, *supra*. xAI does not address any of that—beyond dismissing *Silvaco* as "dicta from a state court decision" without engaging with its well-grounded and consistently followed reasoning. OB.44.[11]

Unlike *Silvaco*, the cases on which xAI relies have nothing to do with the passive-active distinction at issue here. *See JustMed*, 600 F.3d at 1129; *Huddleston v. United States*, 415 U.S. 814, 820 (1974) (rejecting argument that "acquisition" requires obtaining "title or ownership" in another context); *United States v. Smith*, 155 F.3d 1051, 1055 (9th Cir. 1998) (observing that indisputably affirmative act of "recording [a] message with a handheld audiotape recording device" is an "acquisition" under the Wiretap Act (internal quotation marks omitted)).[12] As

[11] To the extent xAI suggests that *Silvaco* is not on point because the court was "interpreting California's trade secret law" rather than "the DTSA," OB.44-45, that argument is untenable. xAI's principal authority, *JustMed*, itself interpreted a similar state statute. And as noted, the California law is materially identical to the DTSA, and federal decisions (including ones that xAI cites) routinely interpret the DTSA by looking to precedent construing similar state trade-secret law. *See, e.g.*, *InteliClear*, 978 F.3d at 657-59; *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 909-10 (3d Cir. 2021).

[12] xAI cites the Sedona Conference's recommended jury instructions (OB.29), but they do not address the passive-active distinction either. Sedona Conf., Working Grp. 12, *Defend Trade Secrets Act Model Jury Instructions: 2026 DTSA Tenth*

explained, if anything, *JustMed* supports *OpenAI*'s reading, by recognizing that possession alone does not constitute acquisition, and that there must be subsequent use or disclosure to constitute misappropriation. *See* pp. 36-37, *supra*. Moreover, the full dictionary definition on which *JustMed* relied states that "acquire" means "to come into possession, control, or power of disposal of often *by some uncertain or unspecified means*" (i.e., through some "means," or affirmative conduct), and the same dictionary defines "acquired" as "gained by or as a result of effort or experience." *Acquire, Acquired*, Webster's Third New International Dictionary 18 (2002) (emphasis added). xAI's primary source thus *confirms* rather than refutes *Silvaco*'s construction of acquisition as requiring affirmative conduct directed toward obtaining control.

After offering up definitions from cases that do not consider the core question at issue, xAI turns to a lengthy explanation of why its complaint raises a plausible inference that Li disclosed trade secrets during his interview. OB.29-35. That discussion is beside the point. OpenAI did not argue that the SAC did not sufficiently allege Li's *disclosure* of trade secrets, nor did the district court's order

*Anniversary Commemorative Edition*, Instruction 4.1, 27 Sedona Conf. J. (May 2026). If anything, like the definitions cited above, they define acquisition to involve affirmative effort or exertion. *Id.* (defining acquisition as "gaining of possession or control over something"); *Gain*, Webster's Third New International Dictionary 928 (2002) ("to get or attain to possession . . . of . . . by industry, initiative, merit, or craft").

rest on this ground. Instead, the question is statutory: assuming "Li disclosed," does that mean that "OpenAI thus acquired" under the statute? OB.35. xAI's arguments about why it is reasonable to infer that Li disclosed trade secrets—for example, that an adverse inference can be drawn from his invocation of his Fifth Amendment rights, OB.34-35—do not answer that question.

Nor do any of xAI's authorities confront it. *Allergan, Inc. v. Revance Therapeutics, Inc.*, 711 F. Supp. 3d 873 (M.D. Tenn. 2024), treated allegations that trade secrets were in the "possession, custody, or control" of the defendant as indicating the defendant had "acquired" them. *Id.* at 886. But it did so in the context of assessing whether the defendant, as opposed to only its newly hired employees, possessed the information; it did not consider whether passive receipt constitutes "acquisition" under § 1839(5)(A). *See id.* And, critically, *Allergan* did not need to consider any of the textual or structural concerns addressed here because it found the complaint stated a claim only for misappropriation by *use*—not by acquisition. *See id.* at 888-89, 894-95.

Similarly, in *Source Production & Equipment Co. v. Schehr*, 2017 WL 3721543 (E.D. La. Aug. 29, 2017), the court did not find "acquisition" merely on the basis that a former employee "improperly conveyed" the trade secrets to the defendant competitor. *Id.* at *4. Instead, the court concluded that the defendant had "knowing[ly]" "*accepted*" the conveyed information, *id.*, relying on the

Restatement's example where a disgruntled employee "offers to provide" trade secrets to a competitor and the competitor "accepts" that offer, *id.* (quoting Restatement (Third) of Unfair Competition § 43 cmt. b, illus. 4). Concluding that acquisition can be satisfied where a defendant affirmatively accepts an express offer of trade secrets says nothing about whether, as xAI argues, acquisition is satisfied by merely hearing a disclosure. The particular facts of *Source Production* only emphasize the distinction: the court found that "ample factual content in the amended complaint supports plaintiffs' misappropriation allegation," explaining that the complaint alleged that the defendant hired a former employee and then conspired with him to form a competing business using plaintiff's technology—a "concerted attempt to compete with plaintiffs using plaintiffs' own trade secrets." 2017 WL 3721543, at *4-5. That is a far cry from xAI's "Li disclosed, thus OpenAI acquired" theory.

Most puzzlingly, xAI rewrites the record and attacks a strawman in asserting that the district court inserted an "atextual 'inducement' requirement" in interpreting "acquisition" to require "'active conduct.'" OB.44-45 (quoting ER-10). To start, xAI's pearl clutching over the district court's "focus[]" on "whether OpenAI 'induced' or 'encouraged'" disclosure is remarkable. OB.44. The only reason the district court discussed inducement was because it was initially xAI's *central theory*. *See* pp. 11-12, *supra*. As the district court correctly explained, xAI argued below

that it "pled two theories of misappropriation: (1) OpenAI induced . . . Li to misappropriate xAI's trade secrets; and (2) Li disclosed xAI's trade secrets to OpenAI in a presentation that he delivered during the recruitment process." ER-5. Recognizing the weakness of its inducement theory, xAI has shifted focus on appeal—leading with disclosure, *see* OB.29-35, 44-47, and making inducement an afterthought, *see* OB.47-49. But the district court did not err by addressing both. More to the point, the district court did not impose an "'inducement' requirement." OB.45. The court followed multiple other courts that "interpret[] acquisition under the DTSA to require active conduct" and held that "mere passive receipt of trade secrets is not enough," because that "would run dangerously close to imposing liability for the mere possession of trade secrets." ER-10. The court made no mention of inducement in this discussion.

iii. The DTSA does not convert every disclosure of a trade secret into an acquisition by someone who receives it. Instead, it requires conduct by the defendant directed toward obtaining the trade secret. Thus, even accepting xAI's allegation that Li disclosed xAI trade secrets during his interview—and setting aside whether OpenAI knew what they were—those allegations do not state a claim for misappropriation.

### b. xAI Does Not Plausibly Allege That OpenAI Engaged in Conduct Directed at Obtaining xAI's Trade Secrets.

As a fallback, xAI argues that, to the extent the statute requires something beyond passive receipt, its allegations raise a reasonable inference that OpenAI did engage in "some level of encouragement or inducement." OB.47. They do not.

i. At most, xAI alleged that Li unilaterally disclosed content from a slide deck presentation describing his work at xAI during an interview with OpenAI. xAI offers no allegations whatsoever suggesting that OpenAI took any steps to acquire the purported trade secrets within Li's slide deck. xAI did not allege that OpenAI asked Li to prepare that slide deck. xAI did not allege that OpenAI asked Li to disclose trade secrets. xAI did not even allege that OpenAI encouraged Li to discuss his prior work experience. xAI alleged only, on information and belief, that OpenAI "asks candidates to deliver a presentation about a prior project," and that when these presentations occur, they "typically address[] technical aspects of the project and the candidate's specific contributions." ER-89 ¶ 66. xAI did not allege how often OpenAI asks candidates to deliver such presentations, whether the division to which Li applied does so, or whether OpenAI asks candidates from xAI to do so, much less that OpenAI asked *Li* to do so. At the very most, xAI alleged that Li took it upon himself to divulge information that xAI considers secret during a routine interview, and that OpenAI employees were present to hear him do so. That does not support a reasonable inference that OpenAI did anything to acquire xAI's trade secrets.

Indeed, even if xAI *had* alleged that OpenAI asked Li to deliver a presentation about his prior experiences, absent an allegation that OpenAI took any steps to pursue xAI's trade secrets, that routine request would not support a claim for misappropriation. As discussed, acquisition requires "pointed conduct intended to secure dominion over" the *trade secret*. *Silvaco*, 109 Cal. Rptr. 3d at 40; *see* pp. 33-38, *supra*. This is especially important in cases like this one, where the allegations involve someone other than the defendant employing the "improper means." *See* OB.28 (relying on *Li*'s alleged "breach of a duty to maintain secrecy" as the improper means). Otherwise, non-culpable conduct that is not directed at possession of a trade secret, like inviting someone for an interview, attending a conference, or opening one's email, could constitute "acquisition" of a trade secret.

ii. The allegations that xAI identifies fail to raise a reasonable inference that OpenAI engaged in any conduct aimed at obtaining the trade secrets Li allegedly disclosed. The fact that OpenAI made Li a job offer *after* his interview does not support a reasonable inference that OpenAI engaged in any conduct directed at acquiring the alleged trade secrets in the slide deck Li allegedly presented at that earlier interview. OB.48. xAI does not, for example, allege any facts that OpenAI promised Li employment in exchange for that xAI information or communicated that disclosing trade secrets would improve his chances of employment. As xAI's own case recognizes, without allegations "that the benefits and perks of the

employment offer were contingent in some way on disclosing" trade secrets or some other "additional facts," a job offer to someone who presented their former employer's trade secrets during a job interview does not establish misappropriation by acquisition. *Allergan*, 711 F. Supp. 3d at 886, 895. Nor does xAI allege that Li disclosed any trade secrets to OpenAI after its job offer—i.e., even if that job offer were implausibly seen as encouragement for future misappropriation, no such misappropriation occurred.

Nor does xAI's misleading juxtaposition of Li's alleged theft of xAI's source code with allegations about OpenAI's recruiting communications create a plausible inference that OpenAI "encouraged and facilitated Li's improper disclosure of xAI's trade secrets." OB.48. As with the job interview, those conjectural allegations support no reasonable inference that OpenAI *earlier* sought out the alleged trade secrets within the deck Li had already presented.

To the extent xAI would argue that OpenAI's recruiting outreach was encouraging Li's improper downloads, *see* OB.48-49, that would not establish acquisition, disclosure, or use by OpenAI, and regardless it is not reasonable. xAI does not allege any causal connection between OpenAI's recruiting and Li's activities. xAI instead offers conjecture and insinuation. xAI notes that OpenAI's recruiter sent Li a cloud-storage link, but xAI does not allege what the link was for, that the recruiter requested any xAI material, or even that Li used the link. OB.48

(citing ER-92-93 ¶ 75). Instead, xAI alleges that Li uploaded xAI's material to a *different* "cloud account that OpenAI could access." OB.48 (citing ER-93 ¶¶ 76-78). Specifically, xAI alleged that Li connected his personal cloud account to his personal ChatGPT account as a "[s]ource." ER-93 ¶ 78; ER-97 ¶ 102. But xAI did not allege that Li uploaded xAI information to his personal ChatGPT account, or that the recruiter or anyone else at OpenAI accessed any data within his ChatGPT account. xAI also emphasizes that the recruiter later sent a message saying "nw"—which xAI interprets to mean "no way"—and that the two subsequently met, but xAI does not allege what prompted the message, what the meeting was about, or that the recruiter knew anything about Li's downloads. ER-93-94 ¶¶ 79-81. And xAI points to Li's alleged source code downloading and OpenAI's employment offer but, again, does not allege any facts that could plausibly suggest a connection. ER-94 ¶¶ 82-83. The fact that OpenAI communicated with a candidate it was recruiting at the same time that candidate was, on his own devices and accounts, allegedly taking xAI's trade secrets does not raise a plausible inference that OpenAI knew about, wanted, or encouraged Li's claimed conduct. That xAI is reduced to stitching together these disconnected facts only underscores what is missing from its complaint: any allegation plausibly connecting OpenAI's recruiting activity to Li's misconduct.

### B. xAI's Remaining Conjectural Allegations Do Not Save Its Deficient Misappropriation Claim.

xAI tries to rescue its faulty allegations about Li's alleged interview presentation by gesturing broadly at its other speculative allegations. xAI argues that it pled a "broader campaign of misappropriation by OpenAI" by alleging that OpenAI hired eight individuals and that some of those individuals "stole, or attempted to steal, xAI's confidential information." OB.49-50. xAI's allegations about other employees are just as deficient when considered collectively as they are standing alone.

#### 1. Considered Individually, xAI's Allegations About Other Employees Fall Far Short of Pleading Misappropriation by OpenAI.

xAI does not meaningfully argue that any of its allegations regarding individuals other than Li state a claim for misappropriation considered individually. For good reason.

Starting with Fraiture, xAI complains that he "stole the most valuable and sensitive portions of xAI's infrastructure and training code," OB.50—but xAI offers *nothing* to connect that alleged theft to OpenAI. On xAI's own allegations, Fraiture downloaded code to his personal computer and told xAI that he deleted that code *before joining* OpenAI. *See* OB.16; ER-100-101 ¶¶ 117-118, 123. xAI did not allege that OpenAI ever acquired that code, that Fraiture used it in his work at OpenAI, or even that Fraiture had possession of it when he started work at OpenAI.

*See* ER-100 ¶¶ 117-118. xAI never explains how these allegations support a cognizable misappropriation claim, because they do not. It is axiomatic that merely hiring an employee who once possessed (or even still possesses) a competitor's confidential information does not constitute trade-secret misappropriation by the employer. *See, e.g.*, *Hooked Media*, 269 Cal. Rptr. 3d at 413 (dismissing misappropriation claim despite allegations that plaintiff's former employees, including its CTO, "retained [plaintiff's] technical information, accessed it while in Apple's employ, and gave misleading statements about how much of it they had retained"). As the district court correctly recognized, treating xAI's allegations about Fraiture as sufficient to state a misappropriation claim against OpenAI "would automatically subject future employers to potential trade secret misappropriation liability every time they hired someone who, without their knowledge beforehand or ratification afterwards, had improperly taken confidential information from their former employer on the way out the door, even if there is no indication that the information was actually used in the subsequent job." ER-127. That is not the law.

As to the remaining employees, xAI alleges progressively less and less. First, xAI points to its allegations regarding a "former finance executive" who purportedly shared unspecified confidential financial information. *See* OB.51; ER-102-105 ¶¶ 131-142. That vague allegation provides no basis to infer that OpenAI acquired trade secrets. *See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149

F.4th 1081, 1087 (9th Cir. 2025) (explaining that "not all proprietary information qualifies for protection as a property interest under DTSA" and that plaintiff cannot "simply rely upon 'catchall' phrases or identify categories of trade secrets" (citation omitted)). And with no allegations about the circumstances of the disclosure, xAI offers no facts from which to infer OpenAI's knowledge of the information's allegedly improper provenance.

Second, xAI notes its allegation that Ruddarraju "tried to access" xAI "confidential" (not trade secret) information. OB.51; ER-107-108 ¶ 153. The "tried" is critical there—xAI admits (as it must) that Ruddarraju *did not access* the alleged confidential xAI information, much less disclose it to OpenAI, meaning OpenAI could not have acquired or used that information. ER-128.

Third, xAI references its allegations that Knight and Pham retained unspecified "confidential" information after departing xAI. OB.51-52; ER-107 ¶ 150. Those allegations do not come close to supporting an inference of acquisition or use of trade secrets, much less of such acquisition or use *by OpenAI*. ER-128.

Finally, xAI makes note of OpenAI's hiring of two other employees, suggesting that their hiring was part of a "wider campaign to acquire xAI's trade secrets." OB.50; *see also* OB.18 (identifying those employees as part of alleged eight-person "hiring spree"). Allegations that these employees left xAI and went to

work for OpenAI plainly do not "allow[] a reasonable inference of misappropriation." ER-128.

### 2. The "Gestalt" of the Allegations Does Not Create a Reasonable Inference of Misappropriation.

a. Recognizing the insufficiency of its allegations regarding these former xAI employees, xAI urges the Court to consider the "whole gestalt" of the complaint, saying that analyzed "holistic[ally]" these allegations suggest misappropriation, in some or other form. OB.52-53. But stringing together these inadequate allegations does not transform them into something viable. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1189, 1194 (9th Cir. 2015) (affirming dismissal after concluding that six pieces of circumstantial evidence "add nothing" even when considered "cumulatively"). As the district court correctly recognized, xAI's allegations, even considered collectively, fall short. ER-124-125, 130.

xAI relies on *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180 (N.D. Cal. Aug. 24, 2021), which only illustrates the insufficiency of xAI's allegations. The plaintiff there alleged that its former employee exfiltrated thousands of files and joined a competitor, and that the competitor proceeded to develop a competing aircraft design featuring "all important concepts underlying" the design in a suspiciously short time frame. *Id.* at *3, *15. Hiring the employee alone would not have necessarily implied misappropriation; nor would developing a similar aircraft design. *See id.* at *16. But "woven together," those mutually reinforcing allegations

supported a specific inference that defendant acquired and used plaintiff's trade secrets. *Id.* at *11, *15-16; *see also Oakwood Lab'ys*, 999 F.3d at 912 (inferring misappropriation from, *inter alia*, competitor's improbably fast and cost-efficient development of identical technology after hiring away plaintiff's scientist).

xAI's scattershot allegations lack such force even if woven together. At most, xAI combines several unrelated allegations of impropriety by xAI's former employees. Unlike in *Wisk*, where separate but mutually reinforcing allegations converged to support an inference about a specific act of misappropriation, *see Wisk*, 2021 WL 8820180, at *15-16, xAI does not even attempt to argue that a "holistic" look at the complaint points to any particular instance of misappropriation separate from Li's presentation, OB.52. And, unlike in *Wisk*, where the defendant developed a detailed design for a competing aircraft on a "suspiciously short timeframe," giving rise to an inference about the *defendant's* involvement in misappropriation, 2021 WL 8820180, at *15, xAI makes no such allegation of use by OpenAI and instead focuses on conduct by *others*.

Instead of alleging a "sequence of events" bearing any resemblance to *Wisk*, 2021 WL 8820180, at *15, xAI instead says that its allegations show an "alarming pattern," OB.51. They do not. xAI's allegations do show one "pattern"—that OpenAI hired xAI employees—but there is nothing surprising, much less "alarming," about that. As xAI itself alleges, the parties are locked in a "race to

build the best artificial intelligence models" where success is driven largely by their "expert talent." ER-74 ¶ 2; ER-82 ¶ 34. Given that fierce competition, as xAI further admits, "it is not uncommon for an engineer to leave one AI company for a competitor." ER-102 ¶ 129. Recruiting employees from a competitor is not misappropriation, even where those employees possess trade secrets. *See Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*, 186 Cal. Rptr. 3d 486, 501-02 (Cal. Ct. App. 2015) ("mere solicitation of an employee" "is not illegal" absent misappropriation of trade secrets); *id.* at 504 (courts reject inference of misappropriation based on employees' "knowledge of [prior employer's] trade secrets" as "incompatible with the strong public policy in favor of employee mobility").

Setting aside lawful hiring, xAI's allegations show very little in the way of a pattern. With respect to the finance executive, Ruddarraju, Knight, and Pham, xAI takes issue with *different* ways in which they retained or shared confidential information, *see* pp. 9-10, *supra*, but it does not plausibly allege any common pattern of misconduct, much less a common pattern that could make any specific act of misappropriation by OpenAI plausible. It may have been appropriate for *Wisk* to draw an inference of misappropriation from a former employee's "unusual" and significant downloading of files containing trade secrets combined with the new employer's "suspiciously short timeframe" to develop similar designs. *Wisk*, 2021

WL 8820180, at *15. But it would not be reasonable to infer that OpenAI acquired trade secrets during Li's interview presentation on the basis that Ruddarraju allegedly tried to access an xAI document on Google Drive or that Knight and Pham allegedly retained xAI "work chats and information on their personal devices." ER-107 ¶¶ 150, 153.

What remains is Li and Fraiture—and any overlap in *their* conduct does not give rise to a plausible inference of misappropriation by *OpenAI*. xAI alleged that Li and Fraiture transferred xAI source code to their personal accounts and devices while working at xAI. ER-92-93 ¶¶ 75-76; ER-100 ¶¶ 117-118. But xAI did not allege that either Li or Fraiture provided that code to OpenAI. Nor did xAI allege that either used or even *possessed* that code at OpenAI. These allegations, whether considered individually or together, supply no inference of acquisition or use of xAI's trade secrets by *OpenAI*.[13] xAI seeks to link Li's and Fraiture's alleged misconduct to OpenAI by emphasizing that both spoke to a recruiter at OpenAI when applying to work there. OB.15-16. But alleging that both communicated with a recruiter is tantamount to alleging that both applied to work at OpenAI. That does not suggest misappropriation by OpenAI. As the district court emphasized, although

[13] xAI appears to have walked away from what was initially its central theory below—that OpenAI's alleged inducement of Li's and Fraiture's acts alone (even absent acquisition, disclosure, or use) could constitute statutory misappropriation. SER-94. Rightly so: the DTSA imposes liability for acquiring, disclosing, or using another's trade secrets; not encouraging someone else to do so.

xAI speculated that Li's and Fraiture's contact with OpenAI's recruiter shows that OpenAI induced them to download source code, xAI never alleged that "OpenAI told or encouraged them to do so." ER-124.

b. xAI criticizes the district court for giving "short shrift" to its allegations about employees other than Li, OB.53, but the district court appropriately scrutinized those allegations, ER-126-128, before considering and rejecting xAI's "gestalt" theory. The court "agree[d] that it must examine the entire course of conduct" and assess whether xAI's allegations "taken together" establish misappropriation. ER-124. And the court acknowledged that misappropriation may be inferred from circumstantial evidence. *Compare* ER-129, *with* OB.54 (asserting that district court "asked for direct proof of misappropriation" (citation omitted)). But, the court explained, that does not mean that Rule 12(b)(6) "impose[s] a *lower* standard in trade secret cases." ER-129 (emphasis added); *compare* ER-129, *with* OB.54 (asserting that district court "applied a heightened pleading standard" (citation omitted)). Applying the appropriate standard, the district court correctly rejected xAI's argument that the "amalgamated whole" of its allegations sufficed to state a claim. ER-124, 128-130.[14]

[14] There was nothing improper about the district court not repeating its analysis from the order dismissing the FAC in its order dismissing the SAC. *Contra* OB.53. The district court's order focused on xAI's new allegations. The court was not required to rehash its prior analysis. *See G.B. ex rel. G.P. v. EPA*, 172 F.4th 1042, 1054 (9th Cir. 2026) (considering district court's holdings "[b]etween two dismissal orders");

## II. The District Court Did Not Abuse Its Discretion in Denying xAI a Third Opportunity to Amend Its Complaint.

xAI concludes its brief with a last-gasp request that it be permitted a chance to file yet a *fourth* iteration of its complaint. It should not.

As the district court correctly held, "[a]llowing further amendment would be futile." ER-11. Each of xAI's three complaints suffered from the same deficiency, expressed clearly by OpenAI's initial motion to dismiss and the district court's order dismissing with leave to amend: xAI never "point[ed] to any misconduct by OpenAI." ER-117; *see* ER-194. The district court's order "dismissing the first amended complaint . . . offered a detailed explanation of the complaint's deficiencies and how to correct them." *In re Cloudera, Inc.*, 121 F.4th 1180, 1190 (9th Cir. 2024); *see* ER-123-130. "But [xAI] did not correct the deficiencies," instead "in many instances . . . offer[ing] no new allegations or arguments." *Cloudera*, 121 F.4th at 1190; ER-59-62 (describing SAC's changed allegations). There is no "reason to believe that [xAI] would do better with another try," so leave to amend was properly denied. *Cloudera*, 121 F.4th at 1190; *see also Espy v. J2 Global, Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (holding that district court had "particularly broad"

OB.21 ("district court's reasoning . . . is found across its two dismissal orders"). In any event, the adequacy of the district court's explanation is not a ground for reversal. *See Eclectic Props. E.*, 751 F.3d at 995 (review is de novo).

discretion to deny leave to amend because plaintiff "had previously been granted two chances to amend but still failed to state a claim").

xAI's explanations for how it would have amended its complaint underscore the correctness of the district court's opinion. First, xAI says that it should have been given an opportunity to "attach a copy of the slide deck and to provide additional detail about" it. OB.55. But the district court dismissed the FAC on the express basis that xAI alleged "no facts that permit a reasonable inference that OpenAI knew that the information [in the presentation] was a trade secret." ER-125. Yet xAI opted not to provide the district court with the actual information in the presentation, declining to attach the deck to its sealed SAC. *See* p. 24, *supra*. That was xAI's choice. xAI should not be given a fourth bite at the apple to add facts that have "been available to [xAI] even before the . . . amendment to [its] complaint." *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002).

Second, xAI contends that it should be given leave to amend because it is pursuing discovery in its case against Li, which might turn up "additional supportive evidence that could have been used in an amended complaint." OB.55-56. That argument gets things exactly backwards: xAI does not get to demand discovery to support its pleadings because "pleadings must assert well-pleaded factual allegations to advance to discovery." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021); *Mujica v. AirScan, Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) (discovery

to "satisfy Rule 8's plausibility standard" is "simply incompatible with *Iqbal* and *Twombly*"). xAI's argument in this regard is familiar: it is the same one that xAI made to the district court in moving to stay the case to pursue discovery, a motion that implicitly acknowledged that xAI did not have what it needed to amend its complaint. SER-54. In response, the district court properly held that "xAI was required to have completed its investigation of its claims *before* filing suit, *not after*, and if it lacked the requisite information to allege its claims in the manner required when it filed suit, it should not have sued OpenAI in the first instance." ER-11 (citation modified). xAI's repetition of this argument in this Court provides vivid confirmation that xAI cannot cure its complaint's deficiencies.

Nor does xAI's vague and unsubstantiated reference to parts of a recent OpenAI third-party production provide a basis for amending. OB.55. To demonstrate that leave to amend would not be futile, xAI had to, at minimum, point to some "factual allegation or legal theory it would advance in a fourth complaint that would cure the deficiencies found by the district court." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1099-100 (9th Cir. 2024). xAI comes nowhere close in its vague statement that OpenAI's August 14, 2026 production in the Li Litigation "confirms many of the allegations in the SAC." OB.55.

Beyond being insufficient for amendment, xAI's one-sided and unsupported mischaracterization of the Li production is improper and should be disregarded.

That production is not part of the record on appeal and accordingly not appropriately considered. *See Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002). To avoid any confusion should the Court consider xAI's assertion, however, OpenAI is compelled to clarify: OpenAI does not know what xAI means in saying that the production "confirms" its complaint's allegations. OB.55. OpenAI strongly disagrees that the production adds anything of value—and xAI confirms as much by saying no more about it than "trust me." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A plaintiff may not in substance say 'trust me,' and thereby gain a license for further amendment when prior opportunity to amend had been given.").

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

October 23, 2026

/s/ *Carolyn Hoecker Luedtke*
Carolyn Hoecker Luedtke
Miriam Kim
Gabriel M. Bronshteyn
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Carolyn.Luedtke@mto.com

Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, D.C. 20001

*Counsel for Defendants-Appellees OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC*

## STATEMENT OF RELATED CASES

Appellees are not aware of any related cases that are currently pending in this Court.

October 23, 2026

/s/ *Carolyn Hoecker Luedtke*
Carolyn Hoecker Luedtke

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4486

I am the attorney or self-represented party.

**This brief contains** 13,963 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Carolyn Hoecker Luedtke **Date** October 23, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

18 U.S.C. § 1832. THEFT OF TRADE SECRETS.............................................A1

18 U.S.C. § 1839. DEFINITIONS.......................................................................A1

**18 U.S.C. § 1832. THEFT OF TRADE SECRETS.**

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
>
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,
>
> shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

(b) Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.

**18 U.S.C. § 1839. DEFINITIONS.**

As used in this chapter—

> (1) the term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;
>
> (2) the term "foreign agent" means any officer, employee, proxy, servant, delegate, or representative of a foreign government;

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

(4) the term "owner", with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed;

(5) the term "misappropriation" means—

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

(6) the term "improper means"—

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition; and

(7) the term "Trademark Act of 1946" means the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes1, approved July 5, 1946 (15 U.S.C. 1051 et seq.) (commonly referred to as the 'Trademark Act of 1946' or the 'Lanham Act')."